# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

MARGARET WIKE, on behalf of )
herself and all others )
similarly situated, )
)
    Plaintiff, )
) No. 3:06-0204
v. ) JUDGE ECHOLS
)
VERTRUE, INC., )
f/k/a MEMBERWORKS, INC., )
)
    Defendant. )

## MEMORANDUM

Pending before the Court are Defendant's Motion to Dismiss Or, In The Alternative, Motion

For Summary Judgment (Docket Entry No. 53), Plaintiff's Motion to Strike Vertrue, Inc.'s Reply

Memorandum, Reply Declarations, and Accompanying Exhibits In Support Of Motion To Dismiss

Or, In The Alternative, Motion For Summary Judgment (Docket Entry No. 77), and Defendant's

Objections To United States Magistrate Brown's Discovery Order Dated October 2, 2006 (Docket

Entry No. 83). The parties have responded in opposition to these motions.

## I. PROCEDURAL HISTORY

Plaintiff Margaret Wike brings this class action on behalf of herself and all similarly situated

persons who allegedly have been harmed by the unlawful and deceptive "membership billing"

practices of Defendant Vertrue, Inc.[1] ("Vertrue"). According to the First Amended Class Action

---

[1]According to Plaintiff, the company was formerly known as Memberworks, Inc.
("Memberworks") and changed its name to Vertrue in 2004, after several state Attorneys General
filed consumer protection lawsuits against Memberworks. (First Amended Class Action Complaint
¶¶ 9, 19.) Vertrue asserts that it is not a proper defendant because it is a publicly-held holding

1

Complaint (hereinafter "Complaint") (Docket Entry No. 33), Vertrue describes itself as an "integrated marketing services company." (Complaint ¶ 9.) Vertrue's business consists of selling more than twenty (20) membership programs which purport to give consumers exclusive, members-only access to discounts on various consumer goods and services. (Id. ¶¶ 2, 10, 13.) For these memberships, Vertrue charges monthly fees ranging from approximately $9.95 to $19.95 or annual fees ranging from approximately $169.95 to $199.95. (Id. ¶ 10.) The purported discounts that Vertrue sells through its membership programs are widely available, free of charge, through unsolicited direct mailings, newspapers, periodicals, local retailers, and the Internet. (Id. ¶¶ 2, 12.)

Vertrue's business depends upon its ability to "cram" consumers' credit cards and bank accounts with recurring, unauthorized membership charges. (Id. ¶¶ 1, 12.) Plaintiff alleges that Vertrue accomplishes this "cramming" through a common course of unlawful and deceptive conduct (Id. ¶¶ 14-22.) Vertrue markets its memberships as "risk free," and represents that consumers can obtain membership benefits during a "free trial" period at no cost or obligation. (Id. ¶ 14.) Vertrue claims that by accepting offers for "free trials," consumers agree to be enrolled in a Vertrue membership, and that if they cancel within the trial period they will incur no obligation, but if they do not cancel within the trial period, the consumers agree to pay periodic membership fees in perpetuity until they cancel. (Id.)

Plaintiff further alleges that Vertrue's "free trial" offers are misleading, in that: (1) Vertrue does not tell consumers the dates upon which "free trial" periods begin or end; (2) Vertrue's purported "free trial" benefits cannot be accessed without paying membership fees or fulfilling other

---

company, and the membership programs at issue were marketed by its wholly-owned indirect subsidiary, Adaptive Marketing LLC.

2

undisclosed conditions, such as completing surveys or filling out claim forms; (3) Vertrue does not provide consumers with any actual benefits, but instead mails them a "brochure" designed to look like junk mail with a membership identification number and website address inside that consumers must use to access the website for membership information; (4) consumers cannot contact Vertrue during the "free trial" period or thereafter without a membership identification number; and (5) Vertrue's representatives employ various methods to obstruct or disregard efforts by consumers to contact Vertrue, cancel memberships, and remove questionable or unauthorized charges from their credit card bills and bank accounts. (Id. ¶¶ 15-18.)

Further, according to Plaintiff, Vertrue commonly markets its membership programs under the name of a non-affiliated partner, but does not include the partner's name on membership fulfillment materials or billing statements, so as to cause confusion as to the true source of the membership and the nature of subsequent charges. (Id. ¶ 16.) For these reasons, hundreds of consumers have filed complaints and Vertrue's practices have generated consumer protection lawsuits by the Attorneys General of at least seven states, including California, Florida, Iowa, Minnesota, Nebraska, New York and Ohio. (Id. ¶¶ 19-20.)

Plaintiff alleges that, while reviewing her March 2005 bank account statement, she discovered a charge of $19.95 to "Galleria USA." At the time she did not question the charge because she mistakenly thought it was for an online service she had ordered. (Id. ¶ 23.) When a similar charge appeared on her April 2005 bank account statement, Plaintiff called the telephone number listed next to the entry on her bank account statement. An agent informed Plaintiff that the charge was for a membership program which provided coupons and that the membership materials had been mailed to her. Plaintiff responded that she had not authorized the charges and had never

3

received anything from Galleria USA  When the agent offered to send the membership materials again, Plaintiff declined, as she had no interest in the membership  She demanded that her membership be cancelled and the money taken from her bank account refunded, both of which the agent agreed to do.  (Id. ¶ 24.)

Plaintiff did not receive the promised refund and Vertrue continued to bill her for Galleria USA  (Id. ¶ 25 )  Plaintiff again called to complain  In July or August 2005, Plaintiff spoke with a Galleria USA agent who agreed to cancel Plaintiff's account, refund the money taken from her account, and send Plaintiff information explaining how Plaintiff had been enrolled in the membership program.  Plaintiff did not receive this information, and Vertrue continued to take money from Plaintiff's account without providing any refunds.  (Id.)

Plaintiff called Galleria USA again, was put on hold, and was then disconnected  She called back immediately and was funneled to an automated system, which enabled her to cancel her purported Galleria USA membership.  (Id. ¶ 26.)  After cancelling, Plaintiff called the number again to obtain a refund.  She spoke with a customer service agent who agreed to credit her bank account for two months of membership fees, but otherwise refused to provide any information or transfer Plaintiff to the agent's supervisor.  Plaintiff's bank account was credited with two months of charges. (Id.)

Plaintiff was charged $1.00 in February 2005 and $19.95 per month from March through September 2005  Except for the credit for two months, Vertrue refused to honor Plaintiff's demand for a refund  After Plaintiff filed this lawsuit, Vertrue credited Plaintiff's bank account for the balance of the money it had withdrawn.  (Id. ¶ 27.)  Plaintiff's Complaint includes additional class action allegations

4

Plaintiff asserts claims for violations of The Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 *et seq.*, and the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. §§ 47-18-104 *et seq.*. She also asserts Tennessee common law claims for unjust enrichment and conversion, and she seeks declaratory relief.

Plaintiff seeks certification of a nationwide class comprised of all persons from whose accounts Vertrue initiated an electronic fund transfer for one or more Vertrue membership programs from the period March 14, 2005 to the present (the "EFTA Class"), and a statewide class of Tennessee consumers (the "Tennessee Class") comprised of all Tennessee residents who were billed for one or more Vertrue memberships during the period from March 14, 2003 to the present.

Plaintiff filed her initial Complaint on March 14, 2006. On June 21, 2006, Magistrate Judge Joe Brown entered a Case Management Order (Docket Entry No. 31), which provided that Plaintiff would file an amended complaint and a motion for class certification on or before June 30, 2006. Plaintiff apparently represented to Judge Brown at the Case Management Conference that she intended to add additional plaintiffs, (Docket Entry No. 80, Magistrate Judge's October 2, 2006 Order at 2-3), but the Amended Complaint filed by Plaintiff on June 30, 2006, did not add any additional plaintiff parties. The Case Management Order directed the parties to make initial disclosures by July 28, 2006, and identified the general subject matter of the parties' expected discovery requests. While the identified scope of Vertrue's expected discovery was narrow and focused specifically on Plaintiff's experiences, the scope of Plaintiff's expected discovery was much broader, envisioning the development of information necessary to certify the classes. In a subsequent telephone conference, Judge Brown permitted Plaintiff to take a deposition of a former call center

5

employee in Montreal, Canada, "given the fact that the plaintiff is in the process of attempting to make this a class action case[.]" (Docket Entry No. 32, June 30, 2006 Order at 2.)

On August 7, 2006, Vertrue filed the instant Motion To Dismiss Or, In The Alternative, For Summary Judgment, and a Motion for Protective Order To Stay Class Discovery. (Docket Entry No. 45.) By doing so, Vertrue sought to stay all class discovery pending this Court's ruling on the dispositive motion. The Magistrate Judge granted in part and denied in part Vertrue's request for a stay of class discovery. The Magistrate Judge permitted class discovery to go forward essentially as Plaintiff had requested, but limited the scope of discovery as follows:

> (1) to the number of customers enrolled in [Defendant's] membership program, (2) the amount of revenue the Defendant generated from its membership program, (3) evidence regarding customers' purported consent to periodic billing, (4) Vertrue's marketing and promotions materials, (5) usage and cancellation data from Vertrue's membership program, (6) the type and nature of benefits purportedly provided by Vertrue's membership program, (7) the number and nature of customer complaints, (8) Vertrue's cancellation and refund practices and policies, and (9) investigation[s] [and] lawsuits conducted by third parties and state or federal government entities concerning Vertrue's business practices since March 22, 2003. The Magistrate Judge also limits discovery to a period that includes two (2) years prior to the date the Plaintiff claims that the first unauthorized withdrawal was made from her account.

(Docket Entry No. 80, October 2, 2006 Order at 3-4.) The Magistrate Judge drew these categories from a letter Plaintiff's counsel sent to Vertrue's counsel on July 26, 2006, but the Magistrate Judge omitted two categories proposed by Plaintiff: "Vertrue's access to and use of confidential consumer billing information" and "how Vertrue purports to ensure customer satisfaction." (Docket Entry No. 63-13.) The Court assumes the Magistrate Judge's omission of these two categories of information was intentional.

6

In response to the Magistrate Judge's ruling, Vertrue filed the pending Objections to Judge Brown's October 2 discovery Order, and continues to seek a stay of discovery pending resolution of the dispositive motion.[2] Because the requested stay of discovery will become moot upon this Court's ruling on the dispositive motion, the Court will first address Vertrue's pending Motion to Dismiss Or, In The Alternative, For Summary Judgment.

## II. FACTS

Vertrue produces the declaration of its Senior Vice President of Sales and Client Services, Douglas Weiss. (Docket Entry No. 53-3, Weiss Decl.) He attests that he has oversight responsibility for, among other things, Vertrue's relationships with its marketing partners, including America Online ("AOL"); marketing over the Internet and over the telephone; processing of orders; fulfillment; billing; call center operations; and the company's business records recording the details of these activities. (Weiss Decl. ¶ 2.) According to Weiss, Vertrue's wholly-owned indirect subsidiary, Adaptive Marketing LLC ("Adaptive Marketing") is responsible for marketing discount membership programs to consumers, not Vertrue. (Id. ¶ 3.)

Weiss produces copies of Adaptive Marketing's business records, which show that Plaintiff purchased memberships in two different membership programs offered by Adaptive Marketing through its business partner, AOL. (Id. ¶¶ 4-5.) On November 14, 2004, Plaintiff purchased a membership in a program known as "Privacy Matters," a membership club that offers credit management and identity theft prevention services through a banner advertisement on the AOL

---

[2] The Local Rules of this Court provide that a party may obtain review of a Magistrate Judge's Order on a non-dispositive matter by filing a "Motion for Review" in accordance with Federal Rule of Civil Procedure 72(a) within ten (10) days after service of the Order to which objection is raised. L.R.M.J. 9(a)(1). The Court will construe Defendant's Objections as a timely Motion for Review, but in the future counsel are directed to comply strictly with the Court's Local Rules.

Case 3:06-cv-00204   Document 98   Filed 03/20/07   Page 7 of 19 PageID #: 2235

website. To purchase that membership, Plaintiff would have clicked on the banner that transferred her to the Privacy Matters landing page, input her MasterCard number, and then submitted her order. On November 14, 2004, Plaintiff received confirmation of her order by email (Id. ¶ 6, Ex. A.). The $1.00 trial fee was charged to Plaintiff's MasterCard on November 15, 2004. The seven-day trial period expired on November 21, 2004, and the next day the first regular monthly fee of $14.95 was charged to Wike's MasterCard. The monthly fee was charged again in December 2004, January 2005 and February 2005. Plaintiff cancelled her membership in Privacy Matters on March 2, 2005 by calling the toll-free number and using the automated system. (Id. ¶¶ 7-8, Ex. A.)

According to Weiss, on February 13, 2005, Plaintiff initiated a telephone call to AOL and, as an AOL member benefit, Plaintiff was offered membership in a program known as "Galleria." Once Plaintiff indicated to AOL that she was interested in hearing more about the offer, AOL transferred the call to a marketer from Influent, Inc., a marketing company retained by Adaptive Marketing. The Influent marketer would have described the offer pursuant to a script furnished by Adaptive Marketing. (Id. ¶¶ 9-10, Ex. B.)

According to Weiss, the Galleria membership was accompanied by a premium offer of a free $50 Wal-Mart gift card. Plaintiff accepted the offer, and once she did so, the processing of the offer was captured on audiotape. A written transcript of that call is provided. (Id. ¶ 11, Exs. C-D.)

Weiss attests that, as reflected on the audiotape recording, Plaintiff stated she was using her Visa card "for her bills," and confirmed her name, address, and telephone number. She then provided her full Visa card number and expiration date. The marketer confirmed with Plaintiff that Galleria would automatically charge the $1.00 trial fee that day and, unless Plaintiff were to cancel within the thirty-day trial period, Galleria would automatically charge the $19.95 monthly fee to

8

Plaintiff's Visa card. The marketer explained that Plaintiff could "start saving with Galleria in the next three business days or cancel to discontinue billing within thirty days ... by calling 800-901-9606." The marketer then offered Plaintiff membership in another program, which Plaintiff declined, stating "I'm not interested in that one." (Id. ¶ 12, Ex. C.)

According to Weiss, the $1.00 trial fee was charged to Plaintiff's Visa card on February 21, 2005. The regular monthly membership fee of $19.95 was charged on March 21, 2005, and each month thereafter through September 2005. (Id. ¶ 13, Ex. D.) A membership kit was mailed to Plaintiff's residence on February 16, 2005. (Id. ¶ 14, Ex. E.)

Weiss further attests that all calls into Customer Service are reflected in Adaptive Marketing's business records. Plaintiff's toll-free calls to Customer Service were received in the Houston call center. Her first call to Customer Service to inquire about her membership in Galleria was on September 6, 2005. (Id. ¶ 15, Ex. D.) According to Weiss, Plaintiff apparently indicated that she may cancel her membership because in an effort to retain Plaintiff as a member, the Customer Service representative offered her coupons for a discount on gas, which Plaintiff accepted. The form to claim the coupons was mailed to Plaintiff's residence on September 7, 2005. (Id. ¶ 15, Exs. D-E, G.)

Plaintiff remained a member of Galleria until October 5, 2005, when she called the toll-free number and cancelled her membership on the automated system. After cancelling her membership, Plaintiff called back and spoke with a Customer Service representative in the Houston call center, one of whom noted in the record that Plaintiff was unhappy because the representative would not give Plaintiff the supervisor's phone number or last name. (Id. ¶ 16, Ex. D.)

9

Weiss further attests that, in accordance with company policy, Plaintiff received a credit on October 6, 2005 for the current and previous monthly charges to her Visa card. Plaintiff called Customer Service again on October 9, 2005, and accessed the automated system, which apparently confirmed that her membership had been cancelled. (Id. ¶ 17-18, Ex. D.) On April 3, 2006, in response to Plaintiff's Complaint, Vertrue credited Plaintiff's Visa card for the monthly fees Plaintiff incurred for her Galleria membership that had not been refunded earlier. (Id. ¶ 19, Ex. D.)

Plaintiff disputes Vertrue's version of events. She attests that, in February 2005, she called her internet service provider, AOL, for technical assistance. After she was on the telephone with the AOL service representative for some time, the representative offered her a "free" $50.00 Wal-Mart card as a "thank you" for her patience. Plaintiff confirmed her AOL account billing information with the AOL representative in order to receive the Wal-Mart card. (Docket Entry No. 67, Wike Decl. ¶¶ 2-4.)

Plaintiff denies that she agreed to purchase a Galleria membership in February 2005. She has no recollection of receiving a "confirmatory" package from Vertrue regarding the Galleria program. (Id. ¶¶ 5-6.)

When Plaintiff discovered an unauthorized charge on her bank statement for "galleriausa" in April 2005, she promptly called the phone number that appeared on her bank statement next to the charge. She advised the Galleria representative that she had not authorized the charges and she wanted a full refund of all funds taken from her bank account. (Id. ¶ 7.) Plaintiff denies that she accepted a discount gas card from Galleria in September 2005 in exchange for not cancelling her membership; rather, she repeated her request that Galleria cancel the membership and provide her

10

with a complete refund. Plaintiff denies that she received a free $50 Wal-Mart gift card for trying Galleria. (Id. ¶¶ 8-9.)

One of Plaintiff's attorneys, Annemarie De Bartolomeo, attests that "Vertrue proffered no direct evidence of what occurred on the call between the telemarketer and Ms. Wike." (Docket Entry No. 70-1, De Bartolomeo Decl ¶ 4.) As counsel, De Bartolomeo is involved in the continuing investigation into the facts and circumstances of Plaintiff's claims against Vertrue. She believes discovery will reveal that the reason there is no direct evidence of what occurred on the call between the telemarketer and Plaintiff is because Vertrue instructs its telemarketers not to record the entirety of their calls with consumers, and that discovery will reveal that Influent's failure to record the entirety of the telemarketing call with Plaintiff was consistent with instructions given by Vertrue. She believes discovery will further reveal that Influent's failure to record the entire telemarketing call with Plaintiff is evidence of bad faith business practice. (Id. ¶¶ 5-8.)

According to De Bartolomeo, as part of initial disclosures Vertrue provided Plaintiff with a compact disc ("CD") containing an audio file in Wav format which Vertrue identified as a "Copy of the audiotape of the February 13, 2005 conversation with Ms. Wike[.]" Plaintiff manually filed with the Court a copy of the CD. (Id. ¶ 9.)

Further, De Bartolomeo states that Plaintiff has not been permitted the opportunity to conduct discovery into the corporate formation, structure, governance or ownership of Vertrue and Adaptive Marketing, and thus, Plaintiff cannot respond to Vertrue's contention that Plaintiff sued the wrong party. (Id. ¶ 10.) Plaintiff also has not had discovery to inquire into Vertrue's internal records to establish its compliance or noncompliance with the EFTA or to demonstrate any bases for a bona fide error exception under the EFTA, in order to respond to the legal arguments made by Vertrue in

11

support of its motion for summary judgment. (Id. ¶ 11.) Counsel identifies fourteen areas of needed discovery to respond to issues raised in Vertrue's motion for summary judgment. (Id. ¶ 12.)

Plaintiff makes numerous lengthy objections to Defendant's Statement of Undisputed Material Facts, to which Vertrue replies with its own lengthy responses to Plaintiff's Objections. Also, Vertrue objects to Plaintiff's Statement of Additional Disputed Material Facts claiming that many of the facts asserted by Plaintiff are immaterial or constitute legal conclusions. The parties' filings unfortunately do not comply with Local Rule 56.01(b) & (c) requiring a concise statement of undisputed and disputed facts.

Moreover, in reply in support of the summary judgment motion, Vertrue provides the Declaration of Steven Taylor and additional exhibits relating to the agreements between Vertrue and Influent. Plaintiff moves to strike Vertrue's reply memorandum, the reply declaration and the accompanying exhibits on the ground that the declaration and exhibits constitute new evidence submitted on reply to which Plaintiff has no opportunity to respond.

Plaintiff's Motion to Strike will be granted in part and denied in part. The Court will strike the Taylor Declaration and the accompanying exhibits, as well as those portions of the reply memorandum which rely on the Taylor Declaration and exhibits. The Court will consider the remainder of Defendant's reply memorandum.

### III. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have

12

been met. See Martin v. Kelley, 803 F.2d 236, 239 n 4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. ANALYSIS

### A. Whether Vertrue is an improper defendant

Vertrue claims it should be dismissed from the suit as an improper party because the membership programs at issue were marketed by its wholly-owned indirect subsidiary, Adaptive Marketing. See Lee v. Toshiba Machine Co., 804 F. Supp. 1029, 1035 (E.D. Tenn 1992) (observing law treats parent and subsidiary corporations as separate parties in absence of strong evidence why their separateness should be disregarded), citing Tennessee Valley Auth. v. Exxon Nuclear Co., 753 F.2d 493, 497-498 (6th Cir 1985). In making this argument, Vertrue relies only on paragraph 3 of

13

the Weiss Declaration. Vertrue did not attempt to provide any evidence concerning the business relationship between Vertrue and Adaptive Marketing or between Vertrue and Influent until Vertrue filed its reply in support of its Motion To Dismiss Or, In The Alternative, For Summary Judgment. The Court granted Plaintiff's motion to strike this evidence and thus, the Court does not consider it for purposes of ruling on this issue. Vertrue could have presented the evidence of corporate status with its initial motion, but the Court will not allow Vertrue to sandbag the Plaintiff by first presenting the evidence in reply.

Moreover, <u>Lee</u> and <u>Tennessee Valley Auth.</u> recognize that the inquiry into corporate status is fact-driven. <u>Lee</u>, 804 F. Supp. at 1035; <u>Tennessee Valley Auth.</u>, 753 F.2d at 497-498. Plaintiff points to Vertrue's public 2005 Form 10-K filing with the Securities and Exchange Commission, in which Vertrue identifies itself as a "leading consumer services marketing company" and reveals that it has

> two reportable business segments: Marketing Services, formerly known as the Membership segment, and Personals. The Marketing Services business segment provides discounted products and services to customers on a subscription basis."

(De Bartolomeo Decl., Ex. A, Part I, Item 1.) The Form 10-K describes Vertrue's marketing efforts as well as the location of its call centers throughout the country, including in Houston. It also identifies five "significant subsidiaries," but Adaptive Marketing is not among them. (<u>Id.</u>, Ex. A, Ex. 21.1.) Plaintiff contends that she has not had an opportunity at this early stage of the litigation to explore the facts which would determine whether Vertrue and Adaptive Marketing operate as separate entities. <u>See</u> Fed.R.Civ.P. 56(f). Any line between Vertrue and Adaptive Marketing is already somewhat blurred in this record because Douglas Weiss, a senior executive with Vertrue,

14

through his declaration, has presented business records of Adaptive Marketing and attempted to lay the foundation for the admissibility of those business records.

The Court concludes that disputed issues of fact exist concerning the corporate status of Vertrue, Adaptive Marketing, and Influent such that Vertrue's Motion To Dismiss Or, In The Alternative For Summary Judgment, on this issue cannot be granted at this time.

## B. Violations of the EFTA

Vertrue next contends that Plaintiff's claims under the EFTA should be dismissed. According to Vertrue, the EFTA applies here only because, unbeknownst to Adaptive Marketing, the Visa card that Plaintiff used to purchase her Galleria membership apparently was a debit card, not a credit card. Vertrue represents that debit card transactions, but not credit card transactions, are electronic fund transfers covered by the EFTA. Vertrue contends that the audiotape of Plaintiff's conversation with the Galleria marketer concerning the purchase of a Galleria membership disposes of Plaintiff's claim that Vertrue violated the EFTA by engaging in unauthorized electronic fund transfers.[3] Moreover, Vertrue contends that Plaintiff's claim based on "preauthorized electronic fund transfers" under § 1693e should be dismissed because the claim is time-barred and, in any event, Plaintiff's oral authorization to the telemarketer to debit her account constitutes an "electronic signature" under the Electronic Signatures in Global and National Commerce Act, 15 U.S.C § 7001,

---

[3]As relevant here, "the term 'unauthorized electronic fund transfer' means an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit, but the term does not include any electronic fund transfer (A) initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer, unless the consumer has notified the financial institution involved that transfers by such other person are no longer authorized[.]" 15 U.S.C § 1693a(11).

15

*et seq* , and therefore satisfies the requirement for a written authorization for preauthorized electronic fund transfers.

Plaintiff correctly points out that the incomplete and disputed factual record does not permit the Court to rule on these intricate legal questions at the present time. The parties dispute what took place during the February 13, 2005 conversation between Plaintiff and the telemarketer. Vertrue claims the audiotape confirms that Plaintiff agreed to buy a Galleria membership and orally authorized the telemarketer to debit her account. Plaintiff contends the audiotape recording of part of the telephone call does not give the entire picture of what occurred, and Plaintiff flatly denies that she agreed to purchase a Galleria membership. Where critical factual information is missing or disputed as to what, if anything, Plaintiff authorized, the Court cannot resolve as a matter of law whether the claims are time-barred and whether Vertrue's conduct violated complex federal statutes and regulations. Because genuine issues of material fact exist, Vertrue is not entitled to summary judgment at this stage of the litigation.

## C. Tennessee Consumer Protection Act ("TCPA")

Similar problems attend the motion to dismiss or for summary judgment on Plaintiff's TCPA claims. Vertrue's motion rests on its view that Plaintiff orally authorized purchase of a Galleria membership and authorized monthly charges to her account on February 13, 2005. Vertrue argues the TCPA claims are time-barred because Plaintiff would have been aware of all the facts necessary to support her claims as of February 13, 2005, and she did not file suit until more than one year later. The Court cannot resolve this limitations issue, however, because Plaintiff declares under penalty of perjury that she did not understand on February 13 that she was authorizing purchase of a Galleria membership or that she was authorizing deductions from her bank account. Moreover, because the

16

record is not well-developed and critical facts are in dispute, the Court cannot rule as a matter of law that Plaintiff's claims under the TCPA must be dismissed for failure to state a claim. The Court must view the allegations of the Complaint and the evidence Plaintiff presents in opposition to the motion to dismiss or for summary judgment in the light most favorable to Plaintiff. Vertrue has not shown the absence of a genuine issue of material fact to entitle it to dismissal or summary judgment as a matter of law.

**D. Unjust enrichment, conversion, and declaratory relief**

Vertrue suggests that Plaintiff cannot proceed on an unjust enrichment theory because the undisputed facts show that a contract existed between Plaintiff and Vertrue, and Plaintiff may exhaust contract remedies: she was offered a membership program, she accepted the offer, and she authorized monthly charges, as demonstrated by the audiotape. See Whitehaven Community Baptist Church v. Holloway, 973 S.W.2d 592, 596 (Tenn. 1998). As stated previously, the facts are disputed; thus, the Court cannot rule as a matter of law that a contract exists between the parties precluding an unjust enrichment claim.

The same factual dispute prevents the Court from granting summary judgment in favor of Vertrue on the conversion claim. Taking the facts in the light most favorable to Plaintiff, she may be able to prove the tort of conversion. See Kinnard v. Shoney's Inc., 100 F. Supp 2d 781, 797 (M.D. Tenn. 2000); Mammoth Cave Prod. Credit Ass'n v. Oldham, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977). Moreover, the Court has insufficient facts before it to determine whether Vertrue appropriated a particular, defined fund of money belonging to the Plaintiff. See Shapo v. O'Shaughnessy, 246 F.Supp.2d 935, 967-968 (N.D. Ill. 2002) ("Without the showing of a specific chattel, a defendant is liable for a debt rather than for a conversion.")

17

Finally, Vertrue concedes that Plaintiff's request for a declaration that Vertrue violated the EFTA and the TCPA is dependent upon the substantive claims. Where facts are in dispute on the substantive claims, the Court must hold any declaratory relief in abeyance as well.

Accordingly, Vertrue's Motion To Dismiss Or, In The Alternative, For Summary Judgment will be denied at this time.

## E. Defendant's Objections to United States Magistrate Brown's Discovery Order Dated October 2, 2006

Because the Court has now ruled on Defendant's pending dispositive motion, Defendant's Objections to that portion of Magistrate Judge Brown's October 2, 2006 Order which refused to stay class discovery are rendered moot and such objections will be overruled as moot.

The Court has carefully reviewed Judge Brown's October 2, 2006 Order, and the Court finds that the Order directing class discovery is not clearly erroneous or contrary to law. Fed.R.Civ.P. 72(a). Because Judge Brown has appropriately defined the limits of class discovery, the Court will affirm Judge Brown's October 2, 2006 Order. Class discovery shall proceed as Judge Brown ordered.

## V. <u>CONCLUSION</u>

For all of the reasons stated, Defendant's Motion to Dismiss Or, In The Alternative, Motion For Summary Judgment (Docket Entry No. 53) will be denied. Plaintiff's Motion to Strike Vertrue, Inc.'s Reply Memorandum, Reply Declarations, and Accompanying Exhibits In Support Of Motion To Dismiss Or, In The Alternative, Motion For Summary Judgment (Docket Entry No. 77) will be granted in part and denied in part. The Motion will be granted in that the Court strikes the Declaration of Steven Taylor, the accompanying exhibits, and those portions of Defendant's Reply

18

Memorandum which rely on the Taylor Declaration and exhibits. (Docket Entry No. 72). The Motion will be denied in that the Court considered the remainder of Defendant's reply memorandum (Docket Entry No. 71).

Defendant's Objections To United States Magistrate Brown's Discovery Order Dated October 2, 2006 (Docket Entry No. 83) challenging Judge Brown's decision not to stay class discovery pending this Court's ruling on the dispositive motion will be overruled as moot. Vertrue's remaining Objections to Judge Brown's October 2 Order requiring limited class discovery to proceed will be overruled on the merits. Judge Brown's Order will be affirmed.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

19