**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| MARGARET WIKE, on behalf of herself and all others similarly situated, | ) ) CASE NO. 3:06-0204 |
| | ) |
| Plaintiff, | ) **Judge Echols/Brown** |
| | ) |
| vs. | ) **CLASS ACTION** |
| | ) |
| VERTRUE, INC. | ) **JURY TRIAL DEMANDED** |
| f/k/a MEMBERWORKS, INC.; | ) |
| ADAPTIVE MARKETING LLC; | ) |
| INFLUENT INC. f/k/a INTERACTIVE | ) |
| TELESERVICES CORPORATION, | ) |
| | \ |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiff Margaret Wike, on behalf of herself and all others similarly situated, alleges as

follows:

**INTRODUCTION**

1.      "Cramming" refers to the practice of imposing unauthorized charges on consumer

billing statements.  Vertrue, Inc., formerly known as MemberWorks, Inc., runs one of the largest

and most sophisticated cramming operations in the United States.  Vertrue reported that it had

6.3 million customers and $579.8 million in annual revenue in Fiscal Year 2005.  Vertrue

reported that it had 6.5 million customers and $658.9 million in annual revenue in Fiscal Year

2006.  In March 2007, Vertrue reported that it had entered into an agreement to be acquired by

Vertrue's management and an investor group in a transaction worth approximately $800 million.

1

2.      Vertrue's ostensible business is the sale of membership programs that provide the consumer with access to discounts on various consumer goods and services. Discounts comparable to those offered by Vertrue are widely available free-of-charge, so there is no meaningful consumer demand for Vertrue's membership programs and Vertrue has no significant "repeat business." Vertrue depends instead on the use of coercive, deceptive and fraudulent practices to generate new business.

3.      Plaintiff Wike, on behalf of herself and all others similarly situated, alleges claims against all Defendants under the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 et seq., against all Defendants under the federal declaratory relief statute, 28 U.S.C. § 2201 et seq., and against all Defendants under the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. §§ 47-18-104 et seq., and for unjust enrichment and conversion.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over the action, which alleges violations of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 et seq. and the declaratory relief statute, 28 U.S.C. §§ 2201 et seq., pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1693m. The Court has supplemental jurisdiction over Plaintiff's state law claims for violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-104 et seq., and for conversion and unjust enrichment, pursuant to 28 U.S.C. § 1367.

5.      The Court also has jurisdiction over the action under 28 U.S.C. § 1332. The aggregated claims of the individual members of the proposed Class exceed the sum or value of $5,000,000, and more than two-thirds of the members of the proposed Class, on the one hand, and Defendants, on the other, are citizens of different states.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) and (c). A substantial part of the events and conduct giving rise to the obligations, liabilities, breaches, and/or violations of law complained of occurred in or emanated from this District, and Defendants conduct business in this District.

## PARTIES

7. Plaintiff Margaret Wike is a resident of Clarksville, Tennessee.

8. Defendant Vertrue, Inc., formerly known as Memberworks, Inc., is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Norwalk, Connecticut.

9. Defendant Adaptive Marketing LLC is a Delaware limited liability company with its principal place of business in Norwalk, Connecticut (collectively with Vertrue, Inc., "Vertrue").

10. Defendant Influent Inc. ("Influent," collectively with Vertrue, Inc. and Adaptive Marketing LLC, "Defendants") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Dublin, Ohio.

## GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

11. Vertrue, Inc. describes itself as an "integrated marketing services company." Previously known as "MemberWorks, Inc.," the company changed its name to "Vertrue" in 2004 as part of a "re-branding" effort. The re-branding effort occurred after several state attorneys general instituted consumer protection lawsuits against the company.

12. Adaptive Marketing LLC is a wholly-owned subsidiary and "operating company" of Vertrue, Inc. Adaptive Marketing LLC shares personnel with Vertrue, Inc. and markets Vertrue's membership programs. There exists, and at all relevant times existed, a unity of

interest and ownership between Vertrue, Inc. and Adaptive Marketing LLC, such that any individuality and separateness between each of them ceased and each is the alter ego of the other in that each entity is completely controlled, dominated, managed and operated without regard for corporate individuality.

13.     Vertrue markets and sells more than 20 membership programs that purport to provide savings on various consumer goods and services.  For these memberships, Vertrue charges customers monthly fees that range from approximately $1 to $19.95 or annual fees that range from approximately $169.95 to $199.95.

14.     Vertrue uses uniform and systematic marketing procedures to sell its memberships to the public.  Vertrue implements and monitors the use of these uniform marketing techniques through contractual arrangements with telemarketing organizations that agree to market Vertrue memberships in accordance with pre-established marketing techniques and practices specified by Vertrue.  Vertrue operatives also visit the telemarketing facilities and make test calls where they pose as consumers.  Vertrue's independent telemarketers include Influent Inc., and its operating subsidiary, Influent Philippines, Inc.

15.     Vertrue claims to secure the consumer's consent to be billed in advance for charges that will recur at regular intervals.  Vertrue never sends the consumer a bill requesting authorization for payment, nor does it send the customer a copy of the purported authorization when made.  Vertrue imposes membership fees for its programs directly against consumers' credit cards, debit cards, and bank accounts.

16.     There is no consumer demand for Vertrue's membership programs.  Discount offers are widely available free-of-charge through unsolicited direct mailings, newspapers and periodicals, local retailers and the Internet.  As there is no market for Vertrue's memberships,

Vertrue's continued success as a business enterprise depends on its ability to cram consumers with membership charges.

17. Over the past four years, Vertrue has marketed and sold at least 24 membership programs having names such as 24 Assistance, 24 Protect Plus, At Home Rewards, BusinessMax, Card Protect Plus, Connections, Essentials, Essentials Gold, Galleria USA, Homeworks Plus, Lifestyle Rewards, Main Street Savings, Passport To Fun, Premier Health Plus, Privacy Matters, Privacy Plus, Shopping Essentials, Simple Escapes, Simply You, Today's Escapes, Travel Source, ValueMax, Your Savings Club and SavingSmart.

18. Vertrue markets its membership programs through various marketing channels, including telemarketing, direct mail and the Internet. Vertrue's telemarketing activities are, in effect, sophisticated "boiler room" operations, involving thousands of low-paid workers who attempt to generate sales activity over the telephone. Vertrue's principal telemarketing channels are known as "outbound" telemarketing and "call transfer" telemarketing. "Outbound" telemarketing consists of traditional "cold calling," with Vertrue operatives making tens of thousands of unsolicited calls to consumers' home numbers. "Call transfer" telemarketing is a form of "inbound" telemarketing. With call transfer telemarketing (also referred to at Vertrue as "Smart Transfer" calling), Vertrue operatives receive the transfer of a customer initiated call. Over the past four years, hundreds of thousands of consumers throughout the United States have been enrolled in and billed for Vertrue's membership programs as a result of Vertrue's telemarketing. Vertrue continues to use telemarketing to market memberships.

19. In both outbound and call transfer telemarketing, Vertrue uses strategic partnerships that it has established with various companies, for example, America Online, Inc. ("AOL"), Greyhound Lines, Inc. ("Greyhound"), and a number of financial institutions, for

5

access to customer list and demographic information. These partnerships are formed in order to market Vertrue's membership programs to the strategic partner's customers. In outbound telemarketing, Vertrue's telemarketers cold call customers of the strategic partners at home. In call transfer telemarketing, customers of the strategic partners who call those companies (for example, seeking customer service) are transferred to Vertrue's telemarketers. In both channels, customers are offered a premium such as a "free $50 Wal-Mart gift card" to sign up for a trial membership in a Vertrue program.

20.     Vertrue promotes the sale of its products through the offer of trial memberships it describes as "risk-free." According to Vertrue, new customers purchase Vertrue products by accepting an offer of a "trial" period of membership in one of Vertrue's discount clubs. Vertrue claims that consumers understand that if they cancel within the free trial period, they will incur no obligation, but if they do not cancel within the free trial period, they consent to pay periodic membership fees in perpetuity until they cancel.

21.     Consumers who receive trial memberships for Vertrue products complain that Vertrue's promotional offers are misleading, in that consumers are not aware that periodic billing will ensue without further authorization from the consumer; that Vertrue makes it impossible to cancel the membership before the expiration of the trial period; that Vertrue initiates periodic billing before the expiration of the trial period; that Vertrue initiates periodic billing even if the consumer has cancelled or attempted to cancel the membership; that the purported benefits of trial membership (typically "gift cards" that can be redeemed at major retailers) cannot be accessed during the trial period; that membership benefits do not have the characteristics attributed to them by Vertrue; that consumers are unable to determine what membership benefits Vertrue actually offers; that membership benefits are difficult or impossible to access or obtain;

6

that the consumer must pay membership fees to access benefits that were supposed to be available during the trial period; that membership benefits are not "risk free;" that membership benefits are worthless; that membership benefits cannot be obtained without filling out claim forms and "surveys" or fulfilling other undisclosed and burdensome conditions; that Vertrue does not provide any actual benefits but instead mails consumers a "brochure" designed to look like junk mail with a membership identification number that the consumer must use to access a website with information about membership benefits; that consumers are unable to contact Vertrue without their "membership number;" that Vertrue impedes the reasonable efforts of consumers to obtain their membership number; that consumers are unable to reach Vertrue's customer service personnel to obtain assistance regarding membership benefits; and that Vertrue lacks any of the attributes of a legitimate business organization.

22.    Vertrue's business practices systematically generate thousands of complaints from individuals who state that they have been billed for a Vertrue membership they never heard of; that they have no idea how they came to be charged for the Vertrue membership; that they do not know how Vertrue acquired the consumer's electronic billing data; that they have not authorized or consented to be enrolled in a Vertrue membership; that they have never heard of Vertrue or any of its membership products; that they have not consented to the release of their billing information to Vertrue; that they do not know what the membership program is or what it purports to offer; that they never authorized Vertrue to access their confidential billing information and do not know how Vertrue came into possession of the information; that they are confused by the line item charges for Vertrue programs appearing on their credit card and bank account statements; that they are billed for Vertrue membership programs whether or not they notify Vertrue of their desire to cancel their membership prior to expiration of the trial period;

that their attempts to stop Vertrue's periodic billings were obstructed or disregarded by Vertrue employees or representatives; that their requests for refunds of the money taken by Vertrue were obstructed or disregarded by Vertrue employees or representatives; and that they are forced to close their credit card and bank accounts and open new accounts in order to protect their accounts from Vertrue's unauthorized billing.

23.     Consumers complain that Vertrue's representatives and agents refuse to cancel their unwanted membership programs upon request; refuse to tell the consumer how he or she was enrolled and how Vertrue gained access to the consumer's confidential billing information; refuse to provide the consumer with proof that the consumer consented to enrollment; improperly condition refunds on the customer providing confidential credit or debit card numbers; and terminate billing for one Vertrue membership program while continuing billing for other Vertrue membership programs, despite the consumer's demand that Vertrue cancel all membership billing.

24.     Consumers further report that they have difficulty locating phone numbers they can use to instruct Vertrue to cancel their accounts, that the phone numbers listed next to the Vertrue charges on their credit card and bank statements do not work, that they are subjected to long hold times, that when they do get through to a live agent they are disconnected, that Vertrue fails to staff telephone lines with sufficient personnel to address cancellation call volume, that Vertrue's agents and representatives are rude and unresponsive, and that Vertrue's agents and representatives deliberately "ping-pong" consumers between customer service representatives.

25.     Vertrue has been sued by the Attorneys General of California, Florida, Iowa, Minnesota, Nebraska, New York, and Ohio in connection with allegations that it charges consumers for membership programs without consumers' authorization and engages in deceptive

8

and misleading marketing practices. As part of its investigation into its recently filed lawsuit, the Iowa Attorney General sent questionnaires to 400 Iowa residents enrolled in Vertrue membership programs. Among the questionnaire respondents, 67% indicated that they did not know they were members and/or that they did not authorize Vertrue to charge them. The Iowa Attorney General reports that, "Most of the rest of the consumers who responded indicated that they had never used their membership, or thought that they had already cancelled. None of those responding said that they were satisfied members."

26. The Better Business Bureau gives Vertrue an "unsatisfactory record" "due to a pattern of complaints concerning unauthorized charges to consumers' credit cards." The BBB's website reported on June 30, 2006 that it had processed a total of 2277 complaints about Vertrue in the previous 36 months, including 765 in the previous year. The conduct giving rise to these complaints continues. Almost one year later, on June 2, 2007, the BBB's website reported that it had processed a total of 2180 complaints about Vertrue in the previous 36 months, including 667 in the previous year. A simple Internet search for "MemberWorks," Vertrue's former corporate name, pulls up hundreds of consumer complaints, including at websites such as www.ripoffreport.com, www.consumeraffairs.com, and www.uspeakout.com.

27. Vertrue is aware of the widespread consumer complaints against it but makes no effort to remedy or suspend the practices which give rise to the complaints. Instead, Vertrue continues to perfect and deploy the promotional techniques that give rise to the complaints. Vertrue also goes to great lengths to impede the efforts of customers to cancel their memberships, as Vertrue has no meaningful "repeat business" or interest in maintaining customer goodwill. Vertrue occasionally refunds membership fee payments to consumers in an effort to forestall legal or regulatory action. Typically, Vertrue will offer a partial refund after a

protracted and often harrowing sequence of attempts by the consumer to reach company representatives and secure a refund.

28.     Vertrue's business practices are particularly oppressive for persons of limited means.  By placing unauthorized charges on consumer credit cards and bank accounts, Vertrue causes consumers to incur additional finance charges, bounced check and Non-Sufficient Funds ("NSF") charges.  As a result of Vertrue's unauthorized debiting of their bank accounts, consumers on fixed incomes report difficulty in making monthly rent payments, child support payments, and other necessary expenditures.

### Plaintiff's Experience

### Plaintiff Margaret Wike

29.     While reviewing her March 2005 bank account statement, Plaintiff Margaret Wike discovered a charge of $19.95 to "Galleria USA."  At that time, Ms. Wike did not question the charge because she mistakenly thought it was for an online service that she had ordered.

30.     When the "Galleria USA" charge appeared on her April 2005 bank account statement, Ms. Wike called the phone number listed next to the "Galleria USA" entry on her bank account statement.  The agent with whom Ms. Wike spoke said the charge was for a membership program that provided coupons and that the membership materials had been mailed to Ms. Wike.  Ms. Wike said that she had not authorized the charges and had never received anything from Galleria USA.  The agent offered to re-send the membership materials to Ms. Wike.  Ms. Wike declined, as she had no interest in a membership in Galleria USA.  Instead, she demanded that her membership be cancelled and the money taken from her bank account refunded, both of which the agent agreed to do.

31.     Ms. Wike did not receive the promised refund and Vertrue continued to bill her for Galleria USA.  As a result, Ms. Wike continued to call to complain.  In approximately July or August 2005, Ms. Wike spoke with a Galleria USA agent who agreed to cancel Ms. Wike's account and refund the money improperly withdrawn from Ms. Wike's bank account.  The agent promised to send to Ms. Wike's home address information regarding how Ms. Wike had been enrolled in Vertrue's membership program.  Ms. Wike never received the information.  Vertrue continued to bill Ms. Wike for Galleria USA and failed to provide any of the promised refunds.

32.     Ms. Wike called Galleria USA for at least the third time.  Ms. Wike was put on hold and then disconnected.  Ms. Wike called back immediately and was funneled into an automated system, which enabled Ms. Wike to cancel her purported Galleria USA membership.  After she canceled, Ms. Wike called the Galleria USA phone number again to obtain a refund.  Ms. Wike spoke with a customer service agent who agreed to credit her bank account two months worth of charges, but otherwise refused to provide her with any information and refused to transfer Ms. Wike to the agent's supervisor.  Ms. Wike was subsequently credited for two months of charges that Vertrue had withdrawn from her account.

33.     In all, Ms. Wike was charged $1.00 in February 2005 and $19.95 from March through September 2005.  Except for two months of charges that she was refunded, Vertrue refused to honor Ms. Wike's demand for a refund of the money withdrawn from her bank account.  After Ms. Wike filed her complaint in this matter, however, Vertrue credited Ms. Wike's bank account for the balance of the money it had improperly withdrawn.

## CLASS ACTION ALLEGATIONS

34.     Plaintiff Wike brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) or (b)(3) on behalf of herself and all other similarly situated persons.

Plaintiff Wike brings this action on behalf of a proposed nationwide Class (the "EFTA Class") defined as follows:

> All persons who were enrolled in one or more Vertrue membership programs from whose accounts Vertrue initiated an electronic fund transfer from the period of March 14, 2005, to the present.

35.     Plaintiff Wike also brings this action on behalf of a proposed statewide class of Tennessee consumers (the "Tennessee Class") (together with the EFTA Class, the "Class"):

> All Tennessee residents who were enrolled via "outbound" or "call transfer" telemarketing in one or more Vertrue membership programs and billed during the period from March 14, 2003 to the present.

36.     Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, any Defendant's officers, directors, and employees; any Defendant's legal representatives, heirs, successors, and assigns; and any Judge to whom this case is assigned and his or her immediate family.

37.     **Numerosity of the Class—Fed. R. Civ. P. 23(a)(1).**  Class members are so numerous that their individual joinder herein is impracticable.  Plaintiff estimates that there are hundreds of thousands of members in the proposed Class.  The precise number of Class members and their addresses are unknown to Plaintiff, but can be obtained from information and records in Defendants' possession and control.

38.     **Existence and Predominance of Common Questions of Law and Fact—Fed. R. Civ. P. 23(a)(2), 23(b)(3).**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

a. Whether Defendants obtained valid authorization from all EFTA Class members to electronically withdraw funds from EFTA Class members' bank accounts for Vertrue's membership programs;

b. Whether the debits from EFTA Class members' accounts initiated by Defendants are "preauthorized electronic fund transfers" within the meaning of 15 U.S.C. § 1693a(9) and § 1693e;

c. Whether Defendants had a duty under the EFTA to obtain EFTA Class members' authorization in writing before debiting their accounts for preauthorized electronic fund transfers;

d. Whether Defendants had a duty under the EFTA to provide EFTA Class members a copy of their written authorization to initiate preauthorized electronic fund transfers from EFTA Class members' accounts;

e. Whether Defendants complied with their duty under the EFTA to provide reasonable advance notice to consumers of the amount and scheduled date of a transfer when a preauthorized transfer may vary in amount;

f. Whether Defendants complied with the requirements of the EFTA in connection with the preauthorized electronic fund transfers Defendants initiated from EFTA Class members' accounts;

g. Whether Defendants refused to reimburse consumers for expenses incurred as a result of Defendants' erroneous electronic fund transfers;

h. Whether Defendants violated the EFTA with respect to Plaintiff Wike and the EFTA Class members;

i.    Whether Defendants' acts and practices deceive or have the capacity to deceive consumers;

j.    Whether Defendants have violated Tennessee's Consumer Protection Act, Tennessee Code Annotated §§ 47-18-104, et seq.;

k.    Whether Defendants converted Tennessee Class members' money;

l.    Whether Defendants have been unjustly enriched.

39.    **Typicality—Fed. R. Civ. P. 23(a)(3).**  Plaintiff Wike's claims are typical of the claims of the EFTA Class members because, as with all other EFTA Class members, Vertrue initiated electronic fund transfers from Plaintiff Wike's bank account without obtaining Plaintiff Wike's authorization in writing or providing her a copy of that authorization.  Plaintiff Wike's claims are typical of the claims of Tennessee Class members in that Plaintiff Wike was enrolled in a Vertrue membership and subjected to the alleged unlawful practices at issue in this matter.

40.    **Adequacy of Representation—Fed. R. Civ. P. 23(a)(4).**  Plaintiff will fairly and adequately protect the interests of Class members.  Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.  Plaintiff has no interests adverse or antagonistic to those of the Class.

41.    **Superiority—Fed. R. Civ. P. 23(b)(3).**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are relatively small compared with the burden and expense that would be entailed by individual litigation of their claims against Vertrue.  It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create

14

the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

42. In the alternative, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

**FIRST CAUSE OF ACTION**
**(For Violations Of The Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 <u>et</u> <u>seq.</u>)**
**(Against Vertrue, Inc. and Adaptive Marketing LLC)**

43. Plaintiff Wike, on behalf of herself and the EFTA Class, hereby realleges and incorporates by reference all paragraphs previously alleged herein.

44.     The purpose of the EFTA is "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems." 15 U.S.C. § 1693. The primary objective of the EFTA "is the provision of individual consumer rights." Id.

45.     Plaintiff Wike maintained an "account" as that term is defined in 15 U.S.C. § 1693a(2).

46.     Plaintiff Wike is a "consumer" within the meaning of 15 U.S.C. § 1693a(5).

47.     Defendants engaged in "preauthorized electronic fund transfers," as that term is defined in 15 U.S.C. § 1693a(9), by debiting Plaintiff Wike's bank account on a monthly basis.

48.     Defendants engaged in "unauthorized electronic fund transfers," as that term is defined in 15 U.S.C. § 1693a(11), by debiting Plaintiff Wike's bank account without her authorization.

49.     The EFTA provides that "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a). "In the case of preauthorized transfers from a consumer's account to the same person which may vary in amount . . . the designated payee shall, prior to each transfer, provide reasonable advance notice to the consumer, in accordance with the regulations of the Board, of the amount to be transferred and the scheduled date of the transfer." 15 U.S.C. § 1693e(b).

50.     As alleged herein, Defendants failed to comply with their duties under the EFTA because, during the EFTA Class period, Defendants initiated electronic fund transfers from Plaintiff Wike's account, without obtaining Plaintiff Wike's authorization in writing and without providing Plaintiff Wike with a copy of the authorization when made. Defendants have similarly

16

initiated electronic fund transfers from the accounts of EFTA Class members without obtaining their authorization in writing or providing them with a copy of the authorization when made.

51.     Defendants further failed to comply with the EFTA in that, insofar as Defendants purport to obtain consumer consent through telephonic tape-recording or electronic means, Defendants failed to comply with the requirements of the Electronic Signatures In Global And National Commerce Act, 15 U.S.C. § 7001 et seq., because Defendants did not obtain from Plaintiff Wike and Class members valid "electronic signatures" within the meaning of 15 U.S.C. § 7006(5), Defendants did not obtain valid consent from Plaintiff Wike and EFTA Class members to provide electronic copies to them of their purported authorizations, and Defendant did not provide to Plaintiff Wike and EFTA Class members any copies of their purported authorizations, in electronic form or otherwise.

52.     Furthermore, Defendants failed to maintain procedures reasonably adapted to avoid initiating electronic fund transfers from consumers' debit accounts when EFTA Class members misidentified their method of payment as a credit card and therefore Defendants were not entitled to debit Class members' accounts in reliance on EFTA Class members' misidentification.

53.     Accordingly, on behalf of herself and the proposed EFTA Class, Plaintiff Wike seeks actual damages, statutory damages, costs of suit, including a reasonable attorneys' fee, and such other relief that the Court deems appropriate, pursuant to 15 U.S.C. § 1693m.

## SECOND CAUSE OF ACTION
### (For Violations Of The Tennessee Consumer Protection Act ("TCPA"), Tennessee Code Annotated §§ 47-18-104 et seq.)
### (Against All Defendants)

54.     Plaintiff Wike hereby realleges and incorporates by reference all paragraphs previously alleged herein.

55.     Plaintiff Wike asserts this claim for relief on behalf of the Tennessee Class.

56.     The TCPA prohibits unfair and deceptive acts or practices.

57.     The purposes of the TCPA are, in part (1) to protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce; (2) to encourage and promote the development of fair consumer practices; and (3) to declare and provide for means for maintaining ethical standards of dealing between persons engaged in business and the consuming public. The TCPA is to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices. Amendments enacted in 1991 allow for class actions under the TCPA.

58.     As set forth herein, Defendants' acts, practices, and conduct violate §§ 47-18-104(a)(5), (12), and (27) of the TCPA in that, among other things, (a) Defendants represented that goods or services have approval, characteristics, uses, or benefits that they do not have; (b) Defendants represented that a consumer transaction confers or involves rights, remedies or obligations that it does not have; and (c) Defendants engaged in other acts and practices which are deceptive to consumers. Defendants' acts, practices, and conduct, as alleged herein, are unfair and are likely to deceive and actually do deceive reasonable consumers, in that in the offer, sale, and promotion of its goods and services, and in the ongoing operation of its business, Defendants make material misrepresentations and omit material facts, or otherwise engage in unfair and deceptive conduct, including, among other things, making misleading promotional offers for trial memberships; misrepresenting the terms and conditions of promotional offers; refusing to cancel memberships; promising to cancel memberships and failing to do so; initiating periodic billing before the expiration of purported trial periods; initiating periodic billing even if the consumer has cancelled or attempted to cancel a membership; claiming trial memberships are

18

"risk free;" offering a trial membership despite the fact that the purported benefits of trial memberships cannot be accessed during the trial period; promoting membership benefits that do not have the characteristics attributed to them; promoting membership benefits that are difficult or impossible for consumers to access or obtain; promoting trial periods despite the fact that the consumer must pay membership fees to access benefits that were supposed to be available during the trial period; mailing consumers membership benefit information that is packaged to look like junk mail; claiming that Vertrue memberships are valuable and will save consumers money and confer other benefits; imposing unreasonable and undisclosed conditions that consumers must fulfill to access membership benefits; operating a business in such a manner that thousands of consumers complain that they have been billed for a product they have never heard of and do not want; demanding payment for sham products that no consumer would voluntarily purchase; demanding payment from consumers while refusing to provide evidence the consumer consented to be charged for a Vertrue membership product; impeding or obstructing the efforts of consumers to cancel their purported memberships; and billing consumers for Vertrue membership programs whether or not they notify Vertrue of their desire to cancel their membership prior to expiration of the trial period.

59. Plaintiff Wike and Tennessee Class members seek actual damages, including treble damages, an injunction prohibiting Defendants from continuing in such practices, restitution, disgorgement of all profits obtained from unfair competition, punitive damages, attorneys' fees and costs, and any other relief that the Court deems necessary or proper.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)
### (Against All Defendants)

60.     Plaintiff Wike hereby realleges and incorporates by reference all paragraphs previously alleged herein.

61.     Plaintiff Wike asserts this claim for relief on behalf of the Tennessee Class.

62.     Defendants have received, and continue to receive, benefits at the expense of Plaintiff Wike and Tennessee Class members and it is inequitable for Defendants to retain these benefits.

63.     Through its unfair and deceptive conduct, Defendants have unlawfully obtained money from Plaintiff Wike and Tennessee Class members for unordered and unwanted membership programs.

64.     Defendants unlawfully have imposed, and continue to impose, charges against Plaintiff Wike's and Tennessee Class members' bank and credit card accounts.

65.     As a direct and proximate result of Defendants' unlawful acts and practices, Plaintiff Wike and Tennessee Class members have paid money to Defendants that they do not owe, and are therefore entitled to restoration of the money they paid to Defendants, along with interest thereon from the date the money was converted by Defendants to the date of judgment.

## FOURTH CAUSE OF ACTION
### (Conversion)
### (Against All Defendants)

66.     Plaintiff Wike hereby realleges and incorporates by reference all paragraphs previously alleged herein.

67.     Plaintiff Wike asserts this claim for relief on behalf of the Tennessee Class.

68.     Defendants have charged and collected money from Plaintiff Wike and Tennessee Class members for purported membership programs without Plaintiff Wike's and Tennessee Class members' authorization. Defendants have thus converted to their own use property belonging to Plaintiff Wike and Tennessee Class members,' namely money, without Plaintiff Wike's and Tennessee Class members' consent. The specific sum of each Tennessee Class member's money converted by Defendants is readily identifiable from information and records in Defendants' possession and control.

69.     As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiff Wike and Tennessee Class members were deprived of the use of their money that was unlawfully converted by Defendants, and are therefore entitled to restoration of their money, along with interest thereon from the date the money was converted by Defendants to the date of judgment, compensatory damages, and punitive damages.

### FIFTH CAUSE OF ACTION
**(For Declaratory Relief Pursuant To 28 U.S.C. § 2201 et seq.)**
**(Against All Defendants)**

70.     Plaintiff Wike hereby realleges and incorporates by reference all paragraphs previously alleged herein.

71.     Plaintiff Wike asserts this claim on behalf of the Class.

72.     An actual controversy, over which this Court has jurisdiction, has arisen and now exists between the parties relating to the legal rights and duties of Plaintiffs and Defendants for which Plaintiffs desire a declaration of rights.

73.     A declaratory judgment is necessary to determine Plaintiffs' and Class members' rights in connection with Defendants' unauthorized charges for their purported membership programs, including, among other things, a declaration that all Defendants have violated the

Electronic Funds Transfer Act, 15 U.S.C. § 1693 et seq.; and a declaration that all Defendants have violated the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-104 et seq.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment as follows:

a.      For an order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and her counsel of record to represent the proposed Class;

b.      For an order declaring that Defendants have violated the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693 et seq.;

c.      For an order declaring that Defendants have violated the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-104 et seq.;

d.      For an order enjoining Defendants' wrongful conduct;

e.      For an order awarding Plaintiff and the Class restitution of all money acquired by Defendants from Plaintiff and Class members;

f.      For an order that Defendants disgorge all profits obtained from unfair competition;

g.      For an order awarding Plaintiff and Class members actual and statutory damages, and interest thereon, pursuant to 15 U.S.C. §1693m;

h.      For an order awarding Plaintiff and the Class compensatory and consequential damages in an amount to be proven at trial, together with interest thereon;

i.      For an order awarding Plaintiff and the Class treble damages;

j. For an order awarding Plaintiff and the Class attorneys' fees and costs of suit, including expert witness fees;

k. For an order awarding Plaintiff and the Class pre-judgment and post-judgment interest;

l. For an order awarding Plaintiff and the Class such other and further relief as this Court deems just and proper.


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.


Respectfully submitted,

Dated: October 18, 2007


/s/ *Gerald E. Martin* (with permission)

Gerald E. Martin (BPR# 20193)
**BARRETT, JOHNSTON & PARSLEY**
217 Second Avenue North
Nashville, Tennessee 37201
Phone: (615) 244-2202
Facsimile: (615) 252-3798

Daniel C. Girard (admitted *pro hac vice*)
A. J. De Bartolomeo (admitted *pro hac vice*)
Steven G. Tidrick (admitted *pro hac vice*)
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Attorneys for Individual and
Representative Plaintiff

23

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2007, I electronically filed the document listed below with the Clerk of the Court:

## SECOND AMENDED CLASS ACTION COMPLAINT

I also certify that on that date the above documents were filed and electronically served on the following using the CM/ECF system:

Robert Allen Horowitz
Greenberg Traurig LLP
200 Park Avenue
New York, NY  10166
(212) 801-2194
Fax:  (212) 224-6114
horowitzr@gtlaw.com

Gerald E. Martin
Barrett, Johnston & Parsley
217 Second Avenue, N
Nashville, TN  37201
(615) 244-2202
Fax:  (615) 252-3798
jmartin@barrettjohnston.com

Robert S. Patterson
Boult, Cummings, Conners & Berry
1600 Division Street, Suite 700
Nashville, TN  37203-0025
(615) 244-2582
Fax:  (615) 252.6335
bpatterson@boultcummings.com

 /s/   Steven G. Tidrick

**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, CA 94108