# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARGARET WIKE, on behalf of** | ) | |
| **herself and all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:06-0204** |
| **v.** | ) | **JUDGE ECHOLS** |
| | ) | |
| **VERTRUE, INC.,** | ) | |
| **f/k/a MEMBERWORKS, INC.,** | ) | |
| **ADAPTIVE MARKETING, LLC;** | ) | |
| **INFLUENT INC. f/k/a INTERACTIVE** | ) | |
| **TELESERVICES CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

This case comes before the Court on Defendants Vertrue Incorporated's And Adaptive Marketing LLC's Motion For Summary Judgment (Docket Entry No. 236), to which Plaintiff Margaret Wike filed a response in opposition (Docket Entry No. 277), and Defendants filed a reply (Docket Entry No. 295). Plaintiff (hereinafter referred to as "Wike") filed a Motion To Strike The Motion For Summary Judgment By Defendants Vertrue, Inc. and Adaptive Marketing LLC (Docket Entry No. 274), to which Defendants Vertrue and Adaptive Marketing filed a response in opposition (Docket Entry No. 296). Wike's motion to strike characterizes Defendants' pending motion for summary judgment as repetitive of an earlier motion for summary judgment filed by Vertrue, but the Court finds that this motion for summary judgment is not duplicative and the Court will deny the motion to strike.

Wike brought this purported class action lawsuit on behalf of herself and all similarly situated persons who claim to have been harmed by the allegedly unlawful and deceptive

"cramming" practices of Vertrue and its wholly-owned subsidiary and operating company, Adaptive Marketing. "Cramming" refers to the practice of imposing unauthorized charges for membership fees on consumer billing statements. (Docket Entry No. 157, Second Amended Class Action Complaint ¶¶ 1, 15). Wike alleges that Vertrue's business is the sale of membership programs through telemarketing and that such programs supposedly provide the consumer with access to discounts on various consumer goods and services. (Id. ¶ 2, 13-15.)

## I. FACTS

On February 13, 2005, Wike spent a lengthy period of time on the telephone with America Online ("AOL") trying to help her friend obtain Internet service. At the end of the call, the AOL technical support person told Wike something along the following lines: "AOL has arranged for you to claim a free $50 Wal-Mart gift card as a member of a special discount service. I'm going to transfer you for more details, okay?" (Docket Entry No. 239-1, Wike Depo. at 69-72, 75, 78-80.) Wike testified she did not remember specifically what the technical support person said, but she knew she was offered a free Wal-Mart card, she thought the free Wal-Mart card was offered as part of her membership with AOL, and she agreed to have her call transferred. (Id. at 72-73.) Wike took notes during her conversation with the AOL technical support person and in those notes she wrote "Galleria" and Galleria's customer service telephone number. However, Wike testified she did not know why she wrote down "Galleria" and she claims she did not have any understanding at the time that there was a relationship between Galleria and the free Wal-Mart gift card. She stated that she wrote down "Galleria" after the AOL technical support person transferred her call. (Id. at 68, 76-77, 80-81.)

2

During Wike's deposition, Defendants questioned Wike about a script Defendants contend the Influent telemarketer used to sell a Galleria membership to Wike on February 13, 2005, after her call was transferred from AOL (Docket Entry No. 242-2), but Wike testified she did not recall most of the conversation with the telemarketer because she was interested only in the free Wal-Mart card.[1] (Id. at 82-85.)  At the deposition, Defendants questioned Wike about a point in the script when the telemarketer said, "Now, only after 30 days with your okay today, we'll automatically charge just $19.95 a month to the credit card you provide us and then each month thereafter at the then current membership rate.  At any time, you can call to cancel, and you will no longer be billed.  And remember, the $50 Wal-Mart gift card, you get to claim as a member, okay?"  (Id. at 85-86.)  When asked, "Do you recall being told that during the call?" Wike answered, "I remember that.  I don't know – you know, I remember an offer being made.  I didn't accept an offer.  The only thing I was interested in was the Wal-Mart card."  (Id. at 86.)  When asked, "Is it your recollection that you were offered a Galleria membership and you declined it?" Wike responded, "I believe there was an offer made.  I don't know that I understood it to be Galleria.  I didn't accept an offer."  (Id.)

The telemarketer made an audiotape of a portion of her conversation with Wike, and Defendants produced the audiotape to Wike during discovery.  (Id. at 87.)  Wike testified at her deposition that she had listened to the audiotape and that she heard her own voice on the tape.  (Id.) Defendants also produced a transcript of the tape recording, which Wike had not seen before.

---

[1]Adaptive Marketing used a separate company located in the Philippines, Defendant Influent, Inc., to handle incoming sales calls transferred from Adaptive Marketing's clients like AOL. (Docket Entry No. 280-8, Weiss Depo. at 10, 12.)  The telemarketer Wike spoke with was employed by Influent.  The Court rules on Defendant Influent's Motion to Dismiss in a separate Memorandum and Order.

3

(Docket Entry No. 242-3.)  After reviewing it, Wike agreed that the transcript was consistent with what she recalled hearing on the audiotape.  (Wike Depo. at 87-88.)

The transcript reveals that Wike provided her name, address, and telephone number to the telemarketer.  (Docket Entry No. 242-3 at 2.)  Thereafter, the following conversation took place:

> TMR (telemarketer):  Thank you, Ms., Ms. Wike, all of the information Ma'am is kept strictly confidential and can only be accessed by authorized personnel.  In order to get the materials out to you Ma'am including the information about how to claim your free $50 Wal-Mart card and to charge the $1 trial fee Ms. Wike I need to know whether you will be using a MasterCard or a Visa – and you are using your Visa card for your bills, correct?
>
> MW (Wike): Right.
>
> TMR: Can you now verify Ma'am expiration date, month and year?
>
> MW:  Let me see.  October of '07.
>
> TMR: That is October of 2007.
>
> MW: Uh-huh.
>
> TMR: Now can you verify card number beginning with 4.  It's 4.
>
> MW: [credit card number given by Wike but redacted by the Court for security reasons]
>
> TMR: Expiration date is 10 of 2007.
>
> MW: Right.
>
> TMR: Now Ms. Wike thank you for this information.  Do remember only authorized personnel can access this information.  We'll get the materials out to you in 2 to 3 business days at the address you provided today.
>
> Just to review, Galleria will automatically charge your card the $1 fee today and after the 30-day trial period, unless of course Ma'am you call to cancel, Galleria will continue membership and each month automatically charge the 19 dollars and 95 monthly fee to the card you provided.  Ms. Wike, Ma'am, will it be alright to charge the $1 trial fee today and the monthly fee of $19 and 95 on your card after, of course, 30 days unless of course you cancel.  O.K.?

4

MW: O.K.

TMR: Great. You can start saving with Galleria in the next three business days or cancel to discontinue billing within thirty days Ma'am by calling 800-901-9606. That number and of course your membership kit will contain all information you need to claim your free $50 Wal-Mart card.

Now as a special thank you Ma'am for reviewing and using Galleria you are also eligible to receive even more savings when you try another program called Simple Escapes. Simple Escapes, Ms. Wike, is a program that offers you a 20% savings at popular stores and restaurants including Kmart, Target, Blockbuster, Barnes and Noble, Burger King, KFC, Bennigans, and many others when you purchase gift cards through, that's through Simple Escapes. Ms. Wike, in all you can save over $2700 per year. Plus you can also get discounted movie tickets to nearly every theatre chain in the country. As well as get up to 50% off participating providers and other travel discounts. And those are just some of the great discounts. Ms. Wike, this absolutely for free, free of charge.

Now, we can start your free 30-day trial period for Simple Escapes and you will be charged just $19 and 95 cents a month but it's only after your free trial period. Okay?

MW: I'm not interested in that one.

TMR: Okay. That's fine Ms. Wike. Only your Galleria membership will be processed. I would like to thank you for agreeing to try Galleria. Again my name is Paula. If you have any questions Ma'am, please give Galleria a call at 800-901-9606. Thank you for your time. Have a nice evening Ma'am. Good-bye.

(Docket Entry No. 242-3 at 3-4.)

Wike testified that she remembered some of this conversation; specifically, she recalled providing her name, address and credit card number with expiration date.[2] (Wike Depo. at 88, 90.)

When asked at her deposition, "Now, what was the $1 trial fee?" Wike answered:

---

[2]The "credit card" was actually Wike's bank account debit card. Adaptive Marketing subsequently made electronic fund transfers from Wike's bank account utilizing the financial information she provided; it did not process charges to a credit card owned by Wike for billing and payment.

5

A.  I understood it if I was interested in what they were offering, other than the free $50 Wal-Mart card.

Q.  (By Mr. Horowitz) So this was in connection with the offer that you declined? Is that your understanding?

A.  That's my understanding.  If I was interested in something, then I would be billed.

Q.  But you – is it your testimony that you already said – you already declined the offer; is that correct?

A.  They were offering something, okay?  I did not agree to that.  Now, if they were going to send me information, and then I would be able to agree to it if I was interested in it.

Q.  But at this point in time, your recollection is you declined whatever it is that was being offered?

A.  I wasn't interested in anything that they were offering other than the Wal-Mart card.

Q.  So you declined the offer?

A.  When – yes.

(Id. at 89-90.)  Wike further testified that she did not understand at the time that a $1 trial fee would be charged to her account that day.  (Id. at 91.)  When asked , "Well, what – what did you mean when you said okay in response to the question, 'Will it be all right to charge the $1 trial fee today and the monthly fee of $19.95 on your card after 30 days unless you cancel?" Wike stated, "If I agreed to this [offer], then it would be charged."  (Id. at 91-92.)  Wike testified she did not understand at the time that she was authorizing charges to her bank card, and she thought she was confirming her billing information for an AOL customer service representative.  (Id. at 94-95, 112.) To the question, "did you understand at that time that there was some relationship between Galleria and the $50 Wal-Mart card?" Wike responded, "During that time, I don't know that I understood

6

that." (Id. at 93.) As to her comment in reference to the Simple Escapes offer, "I'm not interested in that one," Wike testified: "I wasn't interested in the other one. What I was interested in was my Wal-Mart card." (Id. at 93.) Concerning the end of the call when the telemarketer stated, "I would like to thank you for agreeing to try Galleria[,]" Wike testified that she did not "recall agreeing to that." (Id. at 94.)

Wike stated she wrote down the name "Galleria" and the Galleria telephone number during the portion of the call with the telemarketer as shown in the transcript of the audiotape. (Id. at 95-96.) Wike testified that the telemarketer spoke rapidly at some point in the conversation and "so I don't know that I understood everything she was saying." (Id. at 96-97.) When the AOL technical support person transferred Wike's call, Wike thought she was being transferred to AOL customer service. (Id. at 98.)

Adaptive Marketing's initial $1 trial fee was taken from Wike's bank account on February 22, 2005. (Id. at 104-105.) The $1 "CheckCard Purchase" appeared on Wike's bank account statement for the period February 19, 2005 through March 23, 2005 as "galleriausa." (Docket Entry No. 239-5.) Wike testified she reviews her bank account statements every month, but she did not notice the $1 charge for "galleriausa" on February 22, 2005, and she did not question the charge. (Wike Depo. at 106, 121.) Wike did not make any attempt to cancel the Galleria membership during the 30-day trial period. (Id. at 189.)

According to Jeanne Perry, Vice President of Billing Operations for Adaptive Marketing, at the time of a membership sale, the consumer authorizes the $1 trial fee to be charged immediately and the regular monthly membership fees to be charged every 30 days after the expiration of the trial period. The charges occur without any further action by the consumer. (Docket Entry No. 245,

7

Perry Declaration ¶ 5.)  She further attests that, when the sale is added to Adaptive Marketing's system, Adaptive Marketing initiates the pre-authorized charges–the $1 trial fee and each of the monthly charges for the regular membership fees.  Unless the customer cancels the membership, the scheduled charges are processed automatically to the consumer's credit or debit card provided or confirmed by the consumer at the time of the sale without any further action by Adaptive Marketing. (Id. at ¶¶ 4-6.)  Wike does not dispute this for purposes of the summary judgment motion.

Perry further explains that Adaptive Marketing's business records show that Wike agreed to enroll in Galleria on February 13, 2005.  Her membership was added to Adaptive Marketing's system on February 14, 2005, at which time Adaptive Marketing initiated the $1 trial membership fee and the regular monthly charges for the one-year term of the membership.  With no further action after February 14, 2005 by Adaptive Marketing or Wike, the $1 trial fee was processed on February 21, 2005, based on Adaptive Marketing's payment processing schedule and the monthly membership fees were scheduled to be transacted every 30 days beginning on March 21, 2005 and ending on January 16, 2006.  Wike cancelled her Galleria membership on October 5, 2005, at which time Adaptive Marketing cancelled the remaining pre-authorized monthly charges.  (Id. ¶¶ 7-10; Docket Entry No. 242-4.)

Adaptive Marketing claims that on February 16, 2005, it mailed a Galleria membership kit to Wike's residence which included information concerning how to claim the free $50 Wal-Mart card.  (Weiss Declaration ¶ 14 Docket Entry Nos. 242-5 & 242-6.)  Wike did not recall ever seeing the Galleria membership kit, but she "cannot state for sure [she] didn't get it."  (Wike Depo. at 107.) She would not have recognized the name, "Galleria," on the self-mailer if she had received it, even though she wrote "Galleria" and the Galleria telephone number in her notes and she understood from

8

the telemarketer that she would be receiving a membership kit. Wike testified she was watching for something from AOL, not Galleria. Wike does not open all of her mail, and she throws away "junk mail." (Id. at 108-111.)

The first Galleria monthly charge for $19.95 was made to Wike's bank account on March 22, 2005 and appeared on Wike's later bank account statement. She did not question the charge because she thought it was for Pogo, another service she purchased. (Id. at 121; Docket Entry No. 239-5 at 7.) When the $19.95 charge again appeared on Wike's bank account statement on April 21, 2005, Wike claimed she called the telephone number listed next to "galleriausa" on her bank account statement to question the $19.95 charge. (Wike Depo. at 113.) She did not recall if she took any notes of the conversation, and if she obtained the female representative's name, she misplaced it. (Id. at 114-115.) Wike identified herself by name. She did not provide a Galleria membership number and she did not recall the representative asking for a membership number. (Id. at 123-124.) Wike asked about the charge, and to the best of her recollection, the representative stated it was for coupons. (Id. at 115.) Wike did not recall if the representative told her about Galleria. Wike testified she explained to the representative that "that wasn't something I was interested in, and if it was something I did inadvertently, I wanted the charge canceled and taken off my account." (Id.) The representative asked Wike if she had received any information from Galleria and Wike told her "no." The representative offered to send out some information again, but Wike declined. Wike does not believe that the representative made any other offer to her to try to retain her as a Galleria member or to keep her from canceling a Galleria membership. (Id.) Wike told the representative she wanted the charge canceled, and the representative agreed to do so. (Id. at 123, 126.) Wike also testified that "[i]t's possible" that she made the first call to Galleria after April or May 2005. (Id.

9

at 116.)  Wike stated she made several calls to the Galleria telephone number appearing on her bank account statement, but she did not recall the dates of the calls.  (Id. at 122-123.)

When another $19.95 charge for Galleria was taken on May 23, 2005, Wike testified she called again to complain that the membership was not canceled.  She also asked for a credit for that month's charge.  (Id. at 124-126.)   Wike could not recall the conversation specifically, but the representative assured her that the membership would be canceled.  She did not recall if the representative made any offers to try to keep her as a Galleria member.  (Id. at 126-127.)

The monthly charge of $19.95 appeared on Wike's bank account statements on June 21, 2005, July 20, 2005, and August 19, 2005.  Wike called the Galleria number on September 6, 2005 and spoke to "Linda, # 18238" and "Vanessa, 4149," information about which she made notes on her bank account statement showing the August 2005 monthly charge.  (Id. at 130-131; Docket Entry No. 239-3 at 3, 6.)  Wike also wrote down a number, "799176283," given to her by one of the two representatives,  but she testified she did not know what the number referenced.  (Wike Depo. at 131, 140.)  Looking at Adaptive Marketing's computer records during her deposition, Wike agreed the number was her Galleria membership number.  Wike also wrote "Feb 13th" in her notes, but she testified she did not "have a clue" to what that date referred, but it could be the day her call was transferred from the AOL technical service person to a customer service representative.   (Id. at 142-143.)  She later testified that Defendants' records refreshed her recollection that February 13 was the "sold date" of a Galleria membership to her.  (Id. at 145-146.)  Wike's note on the envelope with her August bank account statement included the name "Jacata," but Wike did not recall whether Jacata offered her a $25 gas coupon in exchange for Wike remaining a Galleria member.  (Id. at 152; Docket Entry No. 242-7.)  Wike's notes also included the words, "Not Pogo."  (Id. at 132, 138, 140.)

10

She testified she confirmed during her very first call to the Galleria number that the $19.95 charge was not for Pogo, but she could not explain why she wrote "Not Pogo" on her August 2005 bank account statement, when she claimed to have made several calls to the Galleria number as early as April and May 2005. (Id. at 138-139.) According to Defendants, Wike's September 6, 2005 telephone call was her first call to the Galleria toll-free number listed on her bank account statement.[3] (Docket Entry No. 240, Lynch Declaration ¶ 9.)

---

[3]The parties dispute who is at fault for failing to obtain telephone records from Wike's service provider to show which toll-free numbers were made from Wike's home telephone number on what dates. (Docket Entry Nos. 239-2; 239-7 through 239-12; Docket Entry No. 281, De Bartolomeo Declaration and Exhibits.) By the time the service provider received Wike's request and Defendants' subpoena, the records containing the information no longer existed.

Defendants state their records show that Wike purchased a membership in "Privacy Matters" on November 14, 2004 by clicking on a banner advertisement on the AOL website which took her to a "Privacy Matters" landing page. Wike typed in her MasterCard number and submitted her order. The same day she received a confirmation e-mail and the $1 trial fee for the Privacy Matters membership was charged to her MasterCard on November 15, 2004. The 7-day trial period expired on November 21, 2004 and on November 22, 2004, the first regular monthly fee of $14.95 was charged to Wike's MasterCard. The monthly fee was charged again in December 2004, January 2005 and February 2005. Wike cancelled her "Privacy Matters" membership on March 2, 2005 by calling the toll-free number and using the automated system for members who wish to cancel their memberships. (Docket Entry No. 242, Weiss Declaration ¶¶ 6-8; Docket Entry No. 242-1.)

Wike made three calls from March to April 2005 to the "Privacy Matters" customer service number. During the first call, she cancelled her "Privacy Matters" membership. Later she made two more calls to "Privacy Matters" after she cancelled her membership. (Docket Entry No. 240, Lynch Declaration ¶¶ 3-8; Docket Entry No. 240-1.)

According to Defendants' records, Wike's first call to Galleria Customer Service was on September 6, 2005. She cancelled her Galleria membership during the second call on October 5, 2005. (Id. ¶¶ 9-11.)

Defendants ask the Court to draw an adverse inference in their favor that, if the records of Wike's service provider had been produced, the records would confirm Defendants' documents showing that Wike did not call the toll-free number for Galleria appearing on her bank statements until September 6, 2005. The Court need not reach this issue in light of the Court's disposition of the case.

11

The monthly $19.95 charge appeared on Wike's bank statement on September 20, 2005.
Wike called the Galleria telephone number on October 5, 2005 and spoke to a representative about
canceling the Galleria membership and receiving a refund for the monthly charges. She was placed
on hold and was then disconnected. (Id. at 157; Docket Entry No. 239-4.) She called back and used
the automated system to cancel the Galleria membership. Although she could cancel a membership
through the automated system, she could not receive a credit for prior charges, so she called back
again and spoke with another representative about a credit. Thereafter, she received a refund on
October 7, 2005 of two months' charges of $19.95 each month. (Wike Depo. at 157-169; Docket
Entry No. 239-5 at 10.) Wike called back again on October 9, 2005 and accessed the automated
system, which apparently confirmed that her membership had been cancelled. (Weiss Declaration
¶ 18.)

After Wike filed this lawsuit on March 14, 2006, Defendants unilaterally credited Wike's
bank account on April 4, 2006 for all of the $19.95 monthly charges that had not previously been
refunded and the $1 initial trial period charge. (Wike Depo. at 171; Docket Entry No. 239-6 at 2.)
Defendants did not pay interest on these amounts credited, and Wike claims she did not voluntarily
accept the credit, nor did she have an opportunity to reject the credit made by Defendants.

In support of her opposition to Defendants' summary judgment motion, Wike provides the
declarations of six Influent telemarketers who attest, among other things, that the "official" written
sales script that Defendants contend was used when Influent took incoming sales calls for Adaptive
Marketing was not what was actually said to potential customers during sales calls. They also aver
that the entire conversations with customers were not audio recorded, and customer contact
associates were trained to speak slowly and clearly during the parts, "Just to review," and "Galleria

12

will automatically charge your card the $1 fee today." They were instructed and trained to speak quickly and unintelligibly during the part about the $19.95 monthly fee and to intersperse the phrase "of course" to convey the impression that nothing new was being said to the customer. These telemarketers believe the overall sales practice was coercive and was designed to lull people into ignoring the part about monthly billing so that customers would mistakenly believe that they would simply pay $1 for a 30-day trial and receive a free $50 Wal-Mart gift card. (Docket Entry Nos. 280-2 through 280-7.) Wike contends that, because she never agreed to purchase a Galleria membership, there was no "trial" period and she did not have a "Galleria membership."

## II. **PROCEDURAL HISTORY**

In her Second Amended Complaint filed on October 18, 2007 (Docket Entry No. 157), Wike brought claims against Vertrue and Adaptive Marketing for violation of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693-1693r; the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 *et seq.;* and for declaratory relief under 28 U.S.C. § 2201 *et seq.* She also brought state law claims for unjust enrichment and conversion.

In response to the summary judgment motion, Wike states that she no longer pursues her claim against the Defendants under the TCPA in light of a recent Tennessee Supreme Court decision holding that the TCPA does not provide for class certification of claims. Walker v. Sunrise Pontiac-GMC Truck, Inc., — S.W. 3d —, 2008 WL 375257 (Tenn. 2008). Wike contends that Defendants' arguments addressing her TCPA claim are now moot and should be disregarded.

In light of Wike's representation that she wishes to abandon her TCPA claim, the Court will dismiss the TCPA claim with prejudice. The Court will address Wike's claim under the EFTA and

13

her claim for declaratory relief, as well as her common law claims for unjust enrichment and conversion against both Defendants.

### III. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met.  See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

14

# IV. ANALYSIS

## A. EFTA claim

It is undisputed that the EFTA applies in this case because Wike is a "consumer," 15 U.S.C. § 1693a(5) (defining "consumer" as a natural person); she maintained an "account" as defined in 15 U.S.C. § 1693a(2); and because the Visa card used to make withdrawals from Wike's bank account was a debit card, not a credit card. 15 U.S.C. § 1693a(1) (defining "accepted card or other means of access" to a consumer's account for the purpose of initiating electronic fund transfers to obtain money); 12 C.F.R. § 205.3(b)(1)(v) (defining electronic fund transfers to include transfers resulting from debit card transactions). Defendants seek summary judgment on the EFTA claim on the ground that it is barred by the one-year statute of limitations. Title 15 U.S.C. § 1693m(g) provides: "Without regard to the amount in controversy, any action under this section may be brought . . . within one year from the date of the occurrence of the violation."

Defendants contend that the "date of the occurrence of the violation" was February 14, 2005. On that date Adaptive Marketing added Wike to its Galleria membership roll and, using Wike's bank account information obtained from her the previous day, initiated the "preauthorized electronic fund transfer" for the $1 trial membership fee, to be withdrawn from her bank account on February 21, 2005, and all of the other "preauthorized electronic fund transfers" for the regular monthly charges of $19.95, beginning on March 21, 2005 and continuing for the duration of the one-year membership term. Defendants assert that Adaptive Marketing's action on February 14, 2005 was the sole and last action necessary for Adaptive Marketing to initiate the electronic fund transfers. Defendants argue that the one-year statute of limitations expired on February 14, 2006, before Wike initially filed suit on March 14, 2006, and therefore, her EFTA claim is time-barred.

15

Wike contends that no recurring electronic fund transfers from her bank account actually began until March 22, 2005.  She argues that the first withdrawal from her bank account on February 22, 2005 for $1 was an unauthorized transfer, but it was not a recurring transfer because Adaptive Marketing never again withdrew that amount from her account.  Instead, Adaptive Marketing withdrew recurring and unauthorized monthly amounts of $19.95, the first such transfer occurring on March 22, 2005, and the last occurring on September 20, 2005.  She filed suit on March 14, 2006.  Thus, she claims her EFTA claim was timely filed within one year of these recurring, unauthorized bank withdrawals.

This argument, made in an effort to overcome the summary judgment motion, is inconsistent with the allegations of Wike's Second Amended Complaint.  While her focus in opposition to summary judgment is on the dates of the actual recurring withdrawals of $19.95 from her bank account (because these occurred within one year prior to the filing of her suit), her emphasis in the Second Amended Complaint was on the statutory violations allegedly committed by Adaptive Marketing at the time the withdrawals were initiated and before the actual withdrawals began to occur.  In the Second Amended Complaint, Wike alleged in pertinent part:

47.  Defendants engaged in "preauthorized electronic fund transfers," as that term is defined in 15 U.S.C. § 1693a(9), by debiting Plaintiff Wike's bank account on a monthly basis.

48.  Defendants engaged in "unauthorized electronic fund transfers," as that term is defined in 15 U.S.C. § 1693a(11), by debiting Plaintiff Wike's bank account without her authorization.

49.  The EFTA provides that "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."  15 U.S.C. § 1693e(a).  "In the case of preauthorized transfers from a consumer's account to the

16

same person which may vary in amount . . . the designated payee shall, prior to each transfer, provide reasonable advance notice to the consumer, in accordance with the regulations of the Board, of the amount to be transferred and the scheduled date of the transfer." 15 U.S.C. § 1693e(b).

50. As alleged herein, Defendants failed to comply with their duties under the EFTA because, during the EFTA Class period, Defendants initiated electronic fund transfers from Plaintiff Wike's account, without obtaining Plaintiff Wike's authorization in writing and without providing Plaintiff Wike with a copy of the authorization when made. Defendants have similarly initiated electronic fund transfers from the accounts of EFTA Class members without obtaining their authorization in writing or providing them with a copy of the authorization when made.

51. Defendants further failed to comply with the EFTA in that, insofar as Defendants purport to obtain consumer consent through telephonic tape-recording or electronic means, Defendants failed to comply with the requirements of the Electronic Signatures in Global And National Commerce Act, 15 U.S.C. § 7001 et seq., because Defendants did not obtain from Plaintiff Wike and Class members valid "electronic signatures" within the meaning of 15 U.S.C. § 7006(5), Defendants did not obtain valid consent from Plaintiff Wike and EFTA Class members to provide electronic copies to them of their purported authorizations, and Defendant did not provide to Plaintiff Wike and EFTA Class members any copies of their purported authorizations, in electronic form or otherwise.

52. Furthermore, Defendants failed to maintain procedures reasonably adapted to avoid initiating electronic fund transfers from consumers' debit accounts when EFTA Class members misidentified their method of payment as a credit card and therefore Defendants were not entitled to debit Class members' accounts in reliance on EFTA Class members' misidentification.

(Docket Entry No. 157, Second Amended Complaint at 16-17.)

The gravamen of Wike's EFTA cause of action as pled is that (1) Defendants *initiated* electronic fund transfers from Wike's account (a) without obtaining her authorization in writing; (b) without providing her with a copy of the authorization *when made*; and (c) without obtaining from her a valid electronic signature; and that (2) Defendants failed to maintain procedures reasonably adapted *to avoid initiating* electronic fund transfers from her bank account when the actual method of payment was by debit card, not credit card.

17

As would be expected, Wike's pleading tracked the language of the pertinent statutes. The EFTA provides that "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer *when made*." 15 U.S.C. § 1693(a) (emphasis added). The EFTA defines a "preauthorized electronic fund transfer" as "an electronic fund transfer *authorized in advance* to recur at substantially regular intervals[.]" 15 U.S.C. § 1693a(9)(emphasis added). The EFTA defines an "unauthorized electronic fund transfer" in pertinent part as "an electronic fund transfer from a consumer's account *initiated* by a person other than the consumer *without actual authority to initiate* such transfer and from which the consumer receives no benefit[.]" 15 U.S.C. § 1693a(11) (emphasis added).

The undisputed evidence in this case shows that the electronic fund transfers were initiated and the EFTA statutory violations occurred, if at all, on February 13 and 14, 2005. Wike did not dispute for purposes of the summary judgment motion that Adaptive Marketing *initiates* all of the charges–the first trial monthly fee of $1 and the following monthly fees of $19.95–when the sale of an Adaptive Marketing program, like Galleria, is added to Adaptive's system. (Docket Entry No. 278, Plaintiff's Response to Defendants' Statement Of Undisputed Facts ¶ 4.) Although Wike disputed that Adaptive Marketing "sold" her a Galleria membership on February 13, 2005, (Id. at ¶ 5), she admitted that she provided her debit card information to the telemarketer during the February 13, 2005 telephone call, even though she thought she was speaking with an AOL customer service representative. (Id. ¶ 38.)

Wike did not specifically plead in her Second Amended Complaint that Adaptive Marketing committed EFTA violations on each occasion when a charge for $19.95 was taken from her bank

18

account, and she did not present any evidence to contradict the Declaration of Jeanne Perry that Adaptive Marketing *initiated* all of the bank withdrawals from Wike's account on February 14, 2005. In other words, Wike presented no evidence that Adaptive Marketing took specific actions each month to initiate a withdrawal from her bank account for that month's fee. Thus, if the withdrawals are characterized as "preauthorized," that is, "authorized in advance" of the actual date of withdrawal from the bank account, the undisputed evidence is that these withdrawals were authorized on February 14, 2005. If the withdrawals are characterized as "unauthorized," the undisputed evidence shows that all of the withdrawals were *initiated*– the language used in § 1693a(11)–on February 14, 2005 and at no other time.

Wike contends that it would be absurd to construe the statute as running from the date the payee sets up the process for making unauthorized periodic transfers from the consumer's account. She argues that the payee could wait a year and a day to start making actual monetary transfers from a consumer's account and still successfully argue that any suit for an EFTA violation was barred by the statute of limitations. Citing the standard rule that a limitations period commences when the plaintiff has a complete and present cause of action, Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp., 522 U.S. 192, 201 (1997), Wike seems to argue that her cause of action did not accrue until she discovered the recurring, unauthorized charges on her bank statements.

This argument does not fit within the language of the EFTA statute of limitations or the undisputed facts of the case. First, it cannot be forgotten that the statute of limitations does not speak in terms of a consumer's "discovery" of a cause of action or the "accrual" of a cause of action. The statute explicitly states the lawsuit must be filed "within one year from the date of the occurrence of the violation." Second, the facts on summary judgment show that, on February 14,

19

2005, Adaptive Marketing initiated twelve (12) recurring monthly withdrawals from Wike's bank account to pay for a one-year Galleria membership. That the first recurring charge was for $1 and the others were for $19.95 is not material. What is important for determining the "date of the occurrence of the violation" is that Adaptive Marketing initiated all of the charges in advance on February 14, 2005, to recur on a monthly basis. Once Wike knew of these recurring charges, it was her obligation to sue within one year of the date of the occurrence of the violation if she thought she had a claim.

Wike relies on Schmidt v. Citibank, 645 F.Supp. 214, 216 (D. Conn. 1986), where the district court, in interpreting the Truth-in-Lending Act, ruled that the limitations period commenced each time the bank issued a monthly credit statement without proper disclosures as required by statute. Although the statute of limitations in the Truth-in-Lending Act is nearly identical to the one applicable here because an action under that statutory scheme must also be filed "within one year from the date of the occurrence of the violation[,]" 15 U.S.C. § 1640(e), Schmidt is distinguishable from the case at hand. At issue in Schmidt was the bank's failure to disclose information in periodic statements that were required to be sent to open-end credit card customers. The plaintiff contended that each statement sent to him without the proper information was part of a continuing violation and therefore, the statute of limitations rolled into the future with each new statement. The bank contended that the suit was untimely because the customer filed suit more than one year after he received the first non-conforming, periodic statement from the bank. Schmidt, 645 F.Supp. at 215.

The district court reasoned that periodic statements for open-end consumer credit plans are mandated by 15 U.S.C. § 1637(b), and Congress required inclusion in those periodic statements of monthly and annual rates of interest charged in order to make consumers aware of their credit

20

options so they could decide whether to accept credit from the defendant or shop other lenders. Id. at 216. The court concluded that each periodic statement constituted a discrete and separate invitation to accept credit from the bank. Id. Thus, the creditor's continuing statutory duty to provide consumers the information required by the Truth-in-Lending Act created an obligation to include the required information in each monthly statement and the failure to do so in each statement was a fresh violation of the Act. Id. The court also pointed out that Congress addressed the issue of repetitive violations in periodic statements by limiting plaintiffs to a single recovery, not by imposing an absolute one year cut-off to suits. Id. at 216 n. 1. The court determined that the suit was timely and denied the motion to dismiss. Id. at 216.

The Sixth Circuit, however, reached a different result when construing the statute of limitations of the Truth-in-Lending Act in a mortgage case, where credit was extended on one occasion. In Wachtel v. West, 476 F.2d 1062, 1065 (6th Cir. 1973), the court held that "a credit transaction which requires disclosures under the Act is completed when the lender and borrower contract for the extension of credit." The court stated that the "disclosures must be made sometime before this event occurs" in order to make the opportunity for credit comparison meaningful, for the statute requires disclosure "before the credit is extended." Id. If the disclosures are not made, the violation of the Act occurs, at the latest, when the parties perform their contract. Id. The court concluded that the performance of the contract and the violation of the disclosure requirement took place on October 28, 1970, the date the plaintiffs borrowed money from the defendants, giving a second mortgage on their home for security. Id. at 1063, 1066. The one-year limitations period started on that date and expired before plaintiffs filed suit fifteen months later, barring the action. Id. The Sixth Circuit's opinion that "the date of the occurrence of the violation" was the date credit

21

was initiated supports the Court's determination in this case that "the date of the occurrence of the violation" under the EFTA was the date Adaptive Marketing initiated the electronic fund transfers from Wike's bank account.

Even if <u>Schmidt</u> were the only case cited to the Court on this subject, the Court would still distinguish it on the ground that the EFTA serves a purpose much different from the Truth-in-Lending Act. The purpose of the EFTA is "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems. The primary objective . . . is the provision of individual consumer rights." 15 U.S.C. § 1693(b). The EFTA and its accompanying regulations set the circumstances under which "an electronic terminal, telephonic instrument, or computer or magnetic tape" may be utilized "so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(6). As the Court made clear above, the EFTA focuses on the legal requirements that must be met at the time electronic fund transfers are initiated. <u>See</u> <u>id.</u>; <u>Wachter v. Denver Nat'l Bank</u>, 751 F.Supp. 906, 908 (D. Colo. 1990) ("the Act's focus is upon consumer-initiated or consumer-authorized transfers where electronic devices are utilized in place of face-to-face banking transactions.") Wike recognized this, too, because she pled that Adaptive Marketing failed to comply with four different aspects of the EFTA at the time it initiated withdrawals from her bank account. The undisputed evidence shows that these alleged violations occurred on February 13 and February 14, 2005. Electronic fund transfers subsequently occurred as a result of the actions taken on February 14, and upon seeing those alleged unauthorized charges on her bank account statements, Wike had one year from "the date of the occurrence of the violation" to file suit. 15 U.S.C. § 1693m(g). The alleged EFTA violations

occurred on February 13 and February 14, 2005. Wike did not file suit until March 14, 2006. Therefore, her EFTA claim is time-barred under § 1693m(g).

Because Wike cannot proceed on her EFTA claim and she has forfeited her TCPA claim, there is no basis upon which the Court could grant any relief under the Declaratory Judgment Act. 28 U.S.C. § 2201 *et seq.* Defendants' motion for summary judgment on the EFTA, TCPA and declaratory judgment act claims will be granted.

## B. State common law claims for unjust enrichment and conversion

This leaves only the common law claims for unjust enrichment and conversion alleged by Wike for herself and on behalf of a purported Tennessee class. Defendants contend that Wike's common law claims are moot because, on April 4, 2006, after this lawsuit was filed, they credited her bank account for the $1 trial fee and the monthly charges for $19.95 that were not previously refunded on October 7, 2005. Defendants' unilateral action in crediting charges to Wike's account did not render her claims moot. The Second Amended Complaint demands relief in the form of compensatory and consequential damages, pre-judgment interest, disgorgement of profits, and an order enjoining Defendants' conduct. (Docket Entry No. 157 at 22-23.) Although a motion for class certification was not pending at the time Defendants credited Wike's account, Wike did not voluntarily agree to settle her own claims and the claims of the class, as occurred in <u>Burnet v. City of Columbus</u>, 1 F.3d 390 (6th Cir. 1993), nor did she accept a Rule 68 Offer of Judgment. Defendants present no evidence that they paid Wike interest, that they took any other steps to provide the various types of relief requested in the Second Amended Complaint, or that they credited the accounts of purported class members, as occurred in <u>Manson v. MCI, Inc.</u>, 2005 U.S. Dist. LEXIS 43734 (E.D.Mich. Feb. 24, 2005) (holding case moot where defendant gave full refund for

23

telephone overcharges to named plaintiff and also identified and credited for over-billing all consumer accounts in the purported class), *aff'd on the record at oral argument,* Manson v. MCI, Inc., No. 05-1515 (6th Cir. Apr. 25, 2006) (Docket Entry No. 295-2, Oral Arg. Tr.)  Additionally Defendants rely on the district court opinion in Manson for the proposition that a demand for interest and costs does not create a case or controversy, citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107-108 (1998), but the Steel Co. case does not even mention interest, let alone discuss whether a demand for interest can save a case from mootness.  Moreover, the Sixth Circuit did not address this issue on appeal in the Manson case.

Defendants also contend, however, that a reasonable jury could not find for Wike on the unjust enrichment and conversion claims because the audio recording of the telemarketing call clearly shows that Wike authorized the telemarketer to make charges to her Visa card.  Defendants argue that Wike produced no more than a scintilla of evidence in her favor and it is insufficient to preclude the entry of summary judgment against her.  See Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986).  The Court agrees that Wike has not generated genuine issues of material fact for trial on her unjust enrichment and conversion claims.

"Where a contract is invalid or unenforceable, the court may impose a contractual obligation when the defendant would be unjustly enriched absent a quasi-contractual obligation." Doe v. HCA Health Servs. of Tennessee, Inc., 46 S.W.3d 191, 197 (Tenn. 2001).  In Swafford v. Harris, 967 S.W.2d 319, 324 (Tenn. 1998), the Tennessee Supreme Court explained:

> A quantum meruit action is an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another if the following circumstances are shown:
> (1) There is no existing, enforceable contract between the parties covering the same subject matter;

(2) The party seeking recovery proves that it provided valuable goods or services;

(3) The party to be charged received the goods or services;

(4) The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and

(5) The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

"The elements of an unjust enrichment claim are: 1) '[a] benefit conferred upon the defendant by the plaintiff'; 2) 'appreciation by the defendant of such benefit'; and 3) 'acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.'" Freeman Indus., LLC v. Eastman Chemical Co., 172 S.W.3d 512, 525 (Tenn. 2005) (quoting Paschall's, Inc. v. Dozier, 407 S.W.2d 150, 155 (Tenn. 1966)). "A benefit is any form of advantage that has a measurable value including the advantage of being saved from an expense or loss." Id. This benefit need not be direct. Id. The most significant requirement for recovery under this theory is that the enrichment must be unjust. Id. The plaintiff must also demonstrate that she has exhausted all remedies against the person with whom the plaintiff enjoyed privity of contract. Id.

Here there does not appear to be any need to imply a contract in law on the unjust enrichment theory where a reasonable jury could only find that Wike authorized charges to her Visa card and thereby formed a contract with Defendants to purchase a Galleria membership. Wike listened to the audio-recorded tape produced in discovery and she confirmed at her deposition that she heard her own voice on the tape. Thus, she authenticated the tape for purposes of summary judgment. Wike also reviewed the written transcript of the tape-recorded conversation and agreed that it was an accurate representation of what was said, although she testified that at one point the telemarketer spoke quickly and she may not have understood all that was said. During her deposition, Wike gave

25

extensive self-serving testimony to contradict her own statements to the telemarketer as captured on the audiotape.

The courts do not permit plaintiffs to attempt to create genuine issues of material fact for trial by contradicting their own prior statements and testimony. It is not uncommon for a court to be presented with a situation where a plaintiff who testifies at deposition later files a contradictory affidavit. For instance, in <u>Dotson v. U.S. Postal Serv.</u>, 977 F.2d 976, 978 (6th Cir. 1992), the appellate court wrote:

> A party cannot create a factual dispute by filing an affidavit, after a motion for summary judgment has been made, which contradicts earlier testimony. *Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 315 (6th Cir.1989). Plaintiff misled the district court by opposing the summary judgment motion with two conflicting statements regarding his prior employment termination and made no attempt to explain his inconsistencies. Thus, plaintiff did not establish a genuine issue of material fact. As plaintiff's application fraud precludes an award of relief, an essential element of his handicap discrimination claim, defendants are entitled to summary judgment. *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552 (summary judgment proper where plaintiff fails to prove essential element of claim).

Similarly, in <u>Hughes v. Vanderbilt University</u>, 215 F.3d 543, 549 (6th Cir. 2000), the court stated:

> Plaintiffs are bound by admissions in their pleadings, and a party cannot create a factual issue by subsequently filing a conflicting affidavit. *See Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir.1986) ( "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." ); *Ferguson v. Neighborhood Hous. Servs. of Cleveland, Inc.,* 780 F.2d 549, 551 (6th Cir.1986) ( "Not only are such admissions ... binding before the trial court, but they are binding on appeal as well.").

In this case, by contrast, the Court is presented with evidence of Wike's recorded statements to the telemarketer, which Wike attempted to disavow at her deposition. This Court, like the Sixth Circuit in <u>Fair v. Prime Security Distrib., Inc.</u>, 134 F.3d 371, 1997 WL 810005 at *2 (6th Cir. 1997) (unpublished), "reject[s] the contention that subsequent testimony somehow erased the earlier

26

statements . . . on tape[.]" A plaintiff may not survive a summary judgment motion by submitting self-serving testimony that contradicts a prior authenticated, audio-taped conversation. <u>Harris v. Utica Rental Sys., Inc.</u>, 1996 WL 539954 at *1 (E.D.La. Sept. 20, 1996).

In ¶ 63 of the Second Amended Complaint, as part of the unjust enrichment claim, Wike alleged: "Through its unfair and deceptive conduct, Defendants have unlawfully obtained money from Plaintiff Wike and Tennessee Class members for unordered and unwanted membership programs." A reasonable jury could not find that Wike's Galleria membership was "unordered or unwanted." To the contrary, a reasonable jury would find, based on the recorded conversation, that Wike knowingly ordered the Galleria membership, gave her bank card information to the telemarketer to buy it, and rejected an offer to purchase a "Simple Escapes" membership saying, "I'm not interested in that one." Wike's deposition testimony that she declined the offer of a Galleria membership and wanted only a free $50 Wal-Mart card does not square with the recorded statement. Moreover, the evidence that Wike previously purchased a "Privacy Matters" membership from Defendants less than four months before she purchased a Galleria membership would convince a reasonable jury that Wike knew what she was buying and that she intended to buy it. Her attempts during her deposition to contradict her earlier recorded statements evidencing her willingness and intent to buy a Galleria membership are simply insufficient to create a genuine issue of material fact for trial.

The Court's analysis is not changed by the fact that Wike produced declarations of Influent telemarketers who stated they did not follow the written script precisely during the unrecorded portion of their marketing calls and they believed Defendants' overall process was coercive. Even assuming the truth of these averments, the audio-recorded conversation between Wike and the

telemarketer speaks for itself. At no time during the conversation did Wike interrupt the telemarketer and ask her to slow down, repeat, or clarify her statements, nor did Wike ever ask the telemarketer to explain to her how she could claim a free $50 Wal-Mart gift card with or without buying a Galleria membership. Wike did not ask any questions or indicate any confusion. Instead, she gave her express permission to the telemarketer to charge her account $1 that day and $19.95 per month thereafter for a one-year Galleria membership. Wike rejected the offer to buy a "Simple Escapes" membership, demonstrating that she knew what was being offered to her and she did not feel coerced to buy a membership she did not want. No reasonable jury could consider this taped recording in combination with Wike's deposition testimony and find that the Defendants were unjustly enriched. See Fair, 1997 WL 810005 at *2; Harris, 1996 WL 539954 at *1.

Wike's conversion claim is doomed for the same reasons. Under Tennessee law, conversion is the appropriation of property to one's own use and benefit, by the exercise of dominion over it, in defiance of the plaintiff's right. River Park Hosp., Inc. v. BlueCross BlueShield of Tennessee, Inc., 173 S.W.3d 43, 60 (Tenn. Ct. App. 2002). Under the same analysis stated above, no reasonable jury could find that Defendants converted Wike's money. The recording shows she provided the telemarketer with her bank card information to purchase a Galleria membership and she gave her consent to monthly withdrawals from her bank account to pay for the membership. Other evidence establishes that Adaptive Marketing made subsequent withdrawals from Wike's bank account in accordance with their agreement. Wike's efforts during her deposition to downplay the significance of her recorded statement are insufficient to create genuine issues of material fact for trial on whether Defendants converted Wike's bank funds. See Fair, 1997 WL 810005 at *2 Harris, 1996 WL 539954 at *1.

28

Because Wike has not produced more than a scintilla of evidence in her favor in opposition to the summary judgment motion, see Anderson, 477 U.S. at 252, the Court concludes that summary judgment should be granted in Defendants' favor on the unjust enrichment and conversion claims.

## V.  CONCLUSION

For all of the reasons stated, Defendants Vertrue Incorporated's And Adaptive Marketing LLC's Motion For Summary Judgment (Docket Entry No. 236), will be granted.  Plaintiff Wike's Motion To Strike The Motion For Summary Judgment By Defendants Vertrue, Inc. and Adaptive Marketing LLC (Docket Entry No. 274), will be denied.  This case will be dismissed with prejudice.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE