# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| MARGARET WIKE, on behalf of herself and all others similarly situated, | ) ) ) CASE NO. 3:06-00204 |
| | ) Judge Echols/Brown |
| Plaintiff, | ) |
| vs. | ) CLASS ACTION |
| | ) |
| VERTRUE, INC. f/k/a MEMBERWORKS, INC.; ADAPTIVE MARKETING LLC; INFLUENT INC. f/k/a INTERACTIVE TELESERVICES CORPORATION, | ) JURY TRIAL DEMANDED ) ) ) ) |
| Defendants. | ) ) |

## PLAINTIFF'S RENEWED MOTION FOR LEAVE TO AMEND COMPLAINT TO ADD RICO CLAIMS

Plaintiff Margaret Wike hereby moves before this Court for an order granting leave to amend her complaint to add claims under the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. §§ 1962(c), (d).

The grounds in support of the motion are set forth in the accompanying memorandum of law. If granted leave to amend, Plaintiff will file the proposed complaint attached as Exhibit A to this motion.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order granting leave to amend her complaint to add RICO claims, and authorizing her to file the accompanying proposed complaint.

1

Dated:  December 4, 2009                    Respectfully submitted,


By:   _/s/ Christina H.C. Sharp_____

Daniel C. Girard (admitted *pro hac vice*)
A. J. De Bartolomeo (admitted *pro hac vice*)
Amanda M. Steiner (admitted *pro hac vice*)
Christina H.C. Sharp (admitted *pro hac vice*)
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

Gerald E. Martin (# 20193)
**BARRETT, JOHNSTON & PARSLEY**
217 Second Avenue North
Nashville, Tennessee 37201
Telephone:  (615) 244-2202
Facsimile:  (615) 252-3798

Attorneys for Individual and
Representative Plaintiff

2

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2009, a true and exact copy of the foregoing was served via the Court's Electronic Case Filing System on the following:

| | |
|---|---|
| Robert A. Horowitz<br>Toby S. Soli<br>**GREENBERG TRAURIG LLP**<br>200 Park Avenue<br>New York, New York 10166<br>Telephone: (212) 801-9200<br>Facsimile: (212) 801-6400<br>horowitzr@gtlaw.com<br>solit@gtlaw.com | Robert S. Patterson<br>**BRADLEY ARANT BOULT CUMMINGS LLP**<br>1600 Division Street, Suite 700<br>Nashville, Tennessee 37203<br>Telephone: (615) 244-2582<br>Facsimile: (615) 252-6380<br>bpatterson@babc.com |

*/s/ Christina H.C. Sharp*
CHRISTINA H.C. SHARP

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| MARGARET WIKE, on behalf of herself and all others similarly situated, | ) ) ) | CASE NO. 3:06-0204 |
| | ) | Judge Echols/Brown |
| Plaintiff, | ) ) | |
| vs. | ) ) | CLASS ACTION |
| VERTRUE, INC. f/k/a MEMBERWORKS, INC.; ADAPTIVE MARKETING LLC, | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## [PROPOSED]
## THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiff Margaret Wike, on behalf of herself and all others similarly situated, alleges as follows:

### INTRODUCTION

1.    "Cramming" refers to the practice of imposing unauthorized charges on consumer billing statements.  Vertrue, Inc., formerly known as MemberWorks, Inc., runs one of the largest and most sophisticated cramming operations in the United States.  Vertrue reported that it had 6.3 million customers and $579.8 million in annual revenue in Fiscal Year 2005.  Vertrue reported that it had 6.5 million customers and $658.9 million in annual revenue in Fiscal Year 2006.  In March 2007, Vertrue reported that it had entered into an agreement to be acquired by Vertrue's management and an investor group in a transaction worth approximately $800 million.

1

2.     The ostensible business of Vertrue and co-Defendant Adaptive Marketing LLC is the sale of membership programs that provide the consumer with access to discounts on various consumer goods and services.  Discounts comparable to those offered by Defendants are widely available free of charge, so there is no meaningful consumer demand for their membership programs and they have no significant "repeat business."  Defendants depend instead on the use of coercive, deceptive and fraudulent practices to generate new business.

3.     Plaintiff Wike, on behalf of herself and all others similarly situated, alleges claims against Defendants under the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over the action, which alleges violations of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1693m.

5.     The Court also has jurisdiction over the action under 28 U.S.C. § 1332.  The aggregated claims of the individual members of the proposed Class exceed the sum or value of $5,000,000, and more than two-thirds of the members of the proposed Class, on the one hand, and Defendants, on the other, are citizens of different states.

6.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c).  A substantial part of the events and conduct giving rise to the obligations, liabilities, breaches, and/or violations of law complained of occurred in or emanated from this District, and Defendants conduct business in this District.

## PARTIES

7.      Plaintiff Margaret Wike is a resident of Clarksville, Tennessee.

8.      Defendant Vertrue, Inc., formerly known as MemberWorks, Inc., is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Norwalk, Connecticut.

9.      Defendant Adaptive Marketing LLC is a Delaware limited liability company with its principal place of business in Norwalk, Connecticut.

10.     In this complaint, Vertrue, Inc. and Adaptive Marketing are referred to together as "Defendants."

## GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

11.     Vertrue, Inc. describes itself as an "integrated marketing services company." Previously known as "MemberWorks, Inc.," the company changed its name to "Vertrue" in 2004 as part of a "re-branding" effort. The re-branding effort occurred after several state attorneys general instituted consumer protection lawsuits against the company.

12.     Adaptive Marketing LLC is a wholly-owned subsidiary and "operating company" of Vertrue, Inc. Adaptive Marketing LLC shares personnel with Vertrue, Inc. and markets the membership programs. There exists, and at all relevant times existed, a unity of interest and ownership between Vertrue, Inc. and Adaptive Marketing LLC, such that any individuality and separateness between each of them ceased and each is the alter ego of the other in that each entity is completely controlled, dominated, managed and operated without regard for corporate individuality.

13.     Defendants market and sell more than 20 membership programs that purport to provide savings on various consumer goods and services. For these memberships, Defendants

3

charge customers monthly fees that range from approximately \$1 to \$19.95, or annual fees that range from approximately \$169.95 to \$199.95.

14.     Defendants use uniform and systematic marketing procedures to sell their memberships to the public. Defendants implement and monitor the use of these uniform marketing techniques through contractual arrangements with telemarketing organizations that agree to market Defendants' memberships in accordance with pre-established marketing techniques and practices specified by Defendants. Defendants' operatives also visit the telemarketing facilities and make test calls where they pose as consumers. Defendants' independent telemarketers include Influent Inc., and its operating subsidiary, Influent Philippines, Inc. In this complaint, Influent Inc. and Influent Philippines, Inc. are referred to together as "Influent."

15.     Defendants claim to secure the consumer's consent to be billed in advance for charges that will recur at regular intervals. Defendants never send the consumer a bill requesting authorization for payment, nor do they send the customer a copy of the purported authorization when made. Defendants impose membership fees for their programs directly against consumers' credit cards, debit cards, and bank accounts.

16.     There is no consumer demand for Defendants' membership programs. Discount offers are widely available free of charge through unsolicited direct mailings, newspapers and periodicals, local retailers, and the Internet. As there is no market for Defendants' memberships, their continued success as a business enterprise depends on their ability to cram consumers with membership charges.

17.     Over the past four years, Defendants have marketed and sold at least 24 membership programs having names such as 24 Assistance, 24 Protect Plus, At Home Rewards,

BusinessMax, Card Protect Plus, Connections, Essentials, Essentials Gold, Galleria USA, Homeworks Plus, Lifestyle Rewards, Main Street Savings, Passport To Fun, Premier Health Plus, Privacy Matters, Privacy Plus, Shopping Essentials, Simple Escapes, Simply You, Today's Escapes, Travel Source, ValueMax, Your Savings Club and SavingSmart.

18.     Defendants market their membership programs through various marketing channels, including telemarketing, direct mail, and the Internet.  Defendants' telemarketing activities are, in effect, sophisticated "boiler room" operations, involving thousands of low-paid workers who attempt to generate sales activity over the telephone.  Defendants' principal telemarketing channels are known as "outbound" telemarketing and "call transfer" telemarketing.  "Outbound" telemarketing consists of traditional "cold calling," with Defendants' telemarketing operatives making tens of thousands of unsolicited calls to consumers' home numbers.  "Call transfer" telemarketing is a form of "inbound" telemarketing.  With call transfer telemarketing (also referred to by Defendants as "Smart Transfer" calling), Defendants' operatives receive the transfer of a customer initiated call.  Hundreds of thousands of consumers throughout the United States have been enrolled in and billed for Defendants' membership programs as a result of Defendants' telemarketing.  Defendants continue to use telemarketing to market memberships.

19.     In both outbound and call transfer telemarketing, Defendants use strategic partnerships that they have established with various companies, for example, America Online, Inc., Greyhound Lines, Inc., and a number of financial institutions, for access to customer lists and demographic information.  These partnerships are formed in order to market Defendants' membership programs to the strategic partner's customers.  In outbound telemarketing, Defendants' telemarketers cold call customers of the strategic partners at home.  In call transfer

5

telemarketing, customers of the strategic partners who call those companies (for example, seeking customer service) are transferred to Defendants' telemarketers. In both channels, customers are offered a premium such as a "free $50 Wal-Mart gift card" to sign up for a trial membership in one of Defendants' programs.

20. Defendants promote the sale of their products through the offer of trial memberships they describe as "risk-free." According to Defendants, new customers purchase Defendants' products by accepting an offer of a "trial" period of membership in one of Defendants' discount clubs. Defendants claim that consumers understand that if they cancel within the free trial period, they will incur no obligation, but if they do not cancel within the free trial period, they consent to pay periodic membership fees in perpetuity until they cancel.

21. Consumers who receive trial memberships for Defendants' products complain that Defendants' promotional offers are misleading, in that consumers are not aware that periodic billing will ensue without further authorization from the consumer; that Defendants make it difficult or impossible to cancel the membership before the expiration of the trial period; that Defendants initiate periodic billing before the expiration of the trial period; that Defendants initiate periodic billing even if the consumer has cancelled or attempted to cancel the membership; that the purported benefits of trial membership (typically "gift cards" that can be redeemed at major retailers) cannot be accessed during the trial period; that membership benefits do not have the characteristics attributed to them by Defendants; that consumers are unable to determine what membership benefits Defendants actually offer; that membership benefits are difficult or impossible to access or obtain; that the consumer must pay membership fees to access benefits that were supposed to be available during the trial period; that membership benefits are not "risk free;" that membership benefits are worthless; that membership benefits cannot be

obtained without filling out claim forms and "surveys" or fulfilling other undisclosed and burdensome conditions; that Defendants do not provide any actual benefits but instead mail consumers a "brochure" designed to look like junk mail with a membership identification number that the consumer must use to access a website with information about membership benefits; that consumers are unable to contact Defendants without their "membership number;" that Defendants impede the reasonable efforts of consumers to obtain their membership number; that consumers are unable to reach Defendants' customer service personnel to obtain assistance regarding membership benefits; and that Defendants lack any of the attributes of a legitimate business organization.

22.     Defendants' business practices have systematically generated thousands of complaints from individuals who have stated one or more of the following: that they have been billed for a membership they never heard of; that they have no idea how they came to be charged for the membership; that they do not know how Defendants acquired the consumer's electronic billing data; that they have not authorized or consented to be enrolled in a membership; that they have never heard of Defendants or any of Defendants' membership products; that they have not consented to the release of their billing information to Defendants; that they do not know what the membership program is or what it purports to offer; that they never authorized Defendants to access their confidential billing information and do not know how Defendants came into possession of the information; that they are confused by the line item charges for Defendants' programs appearing on their credit card and bank account statements; that they are billed for membership programs whether or not they notify Defendants of their desire to cancel their membership prior to expiration of the trial period; that their attempts to stop Defendants' periodic billings were obstructed or disregarded by Defendants' employees or representatives;

Case 3:06-cv-00204     Document 337     Filed 12/04/2009     Page 11 of 35

that their requests for refunds of the money taken by Defendants were obstructed or disregarded by Defendants' employees or representatives; and that they are forced to close their credit card and bank accounts and open new accounts in order to protect their accounts from Defendants' unauthorized billing.

23.     Consumers complain that Defendants' representatives and agents refuse to cancel their unwanted membership programs upon request; refuse to tell the consumer how he or she was enrolled and how Defendants gained access to the consumer's confidential billing information; refuse to provide the consumer with proof that the consumer consented to enrollment; improperly condition refunds on the customer providing confidential credit or debit card numbers; and terminate billing for one membership program while continuing billing for other membership programs, despite the consumer's demand that Defendants cancel all membership billing.

24.     Consumers further report that they have difficulty locating phone numbers they can use to instruct Defendants to cancel their accounts; that the phone numbers listed next to Defendants' charges on their credit card and bank statements do not work; that they are subjected to long hold times; that when they do get through to a live agent they are disconnected; that Defendants fail to staff telephone lines with sufficient personnel to address cancellation call volume; that Defendants' agents and representatives are rude and unresponsive; and that Defendants' agents and representatives deliberately "ping-pong" consumers between customer service representatives.

25.     Defendants have been sued or investigated by the Attorneys General of California, Florida, Iowa, Minnesota, Nebraska, New York, Texas, Pennsylvania, and Ohio in connection with allegations that they charge consumers for membership programs without

consumers' authorization and engage in deceptive and misleading marketing practices. As part of its investigation, the Iowa Attorney General sent questionnaires to 400 Iowa residents enrolled in Defendants' membership programs. Among the questionnaire respondents, 67% indicated that they did not know they were members and/or that they did not authorize Defendants to charge them. The Iowa Attorney General reports that, "Most of the rest of the consumers who responded indicated that they had never used their membership, or thought that they had already cancelled. None of those responding said that they were satisfied members."

26.     The Better Business Bureau gives Vertrue an "unsatisfactory record" "due to a pattern of complaints concerning unauthorized charges to consumers' credit cards." The BBB's website reported on June 30, 2006 that it had processed a total of 2277 complaints about Vertrue in the previous 36 months, including 765 in the previous year. The conduct giving rise to these complaints continues. Almost one year later, on June 2, 2007, the BBB's website reported that it had processed a total of 2180 complaints about Vertrue in the previous 36 months, including 667 in the previous year. On October 30, 2009, the BBB's website reported that it had processed a total of 2658 complaints about Vertrue in the previous 36 months, including 924 in the previous year. A simple Internet search for "MemberWorks," Vertrue's former corporate name, pulls up hundreds of consumer complaints, including at websites such as www.ripoffreport.com, www.consumeraffairs.com, and www.uspeakout.com.

27.     Defendants are aware of the widespread consumer complaints against them but make no effort to remedy or suspend the practices which give rise to the complaints. Instead, Defendants continue to perfect and deploy the promotional techniques that give rise to the complaints. Defendants also go to great lengths to impede the efforts of customers to cancel their memberships, as Defendants have no meaningful "repeat business" or interest in

9

maintaining customer goodwill. Defendants occasionally refund membership fee payments to consumers in an effort to forestall legal or regulatory action. Typically, Defendants will offer a partial refund after a protracted and often harrowing sequence of attempts by the consumer to reach company representatives and secure a refund.

28. Defendants' business practices are particularly oppressive for persons of limited means. By placing unauthorized charges on consumer credit cards and bank accounts, Defendants cause consumers to incur additional finance charges, bounced check and Non-Sufficient Funds charges. As a result of Defendants' unauthorized debiting of their bank accounts, consumers on fixed incomes report difficulty in making monthly rent payments, child support payments, and other necessary expenditures.

**<u>Summary Of Plaintiff's Experience</u>**

29. On February 13, 2005, as alleged in more detail below, Plaintiff Margaret Wike was solicited through an Influent telemarketer and enrolled in the "Galleria USA" membership program. On or about February 14, 2005, Defendants caused a $19.95 recurring charge to be automatically deducted every month from the bank account associated with Ms. Wike's debit card, commencing one month later.

30. After Ms. Wike subsequently noticed the charge for "Galleria USA" on her bank account statements, she called the telephone number listed next to the entry to inquire. The agent with whom she spoke told Ms. Wike that she had been enrolled in a membership program that provided coupons. Ms. Wike requested that the membership be cancelled and the money taken from her bank account refunded, both of which the agent agreed to do. Defendants did not refund Ms. Wike's money, and continued to take membership fees from her account. Ms. Wike kept calling to complain. After calling the Galleria USA number for at least the third time,

Ms. Wike succeeded in cancelling her membership through an automated system. In response to Ms. Wike's demand for a full refund, a Galleria USA agent agreed to credit her bank account for only two months worth of charges.

31.     In all, Ms. Wike had been charged $1.00 in February 2005 and $19.95 per month from March through September 2005. After Ms. Wike filed this action, however, Defendants credited her bank account for the balance of the money they had withdrawn.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff Wike brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) or (b)(3) on behalf of herself and all other similarly situated persons. Plaintiff Wike brings this action on behalf of a proposed class (the "EFTA Class") defined as follows:

> All persons who were enrolled in one or more of Defendants' membership programs via telemarketing and from whose accounts Defendants initiated an electronic fund transfer at any time during the period of March 14, 2005 to the present.

33.     Plaintiff Wike also brings this action on behalf of a proposed class (the "RICO Class") defined as follows:

> All persons who were enrolled via "outbound" or "call transfer" telemarketing by Influent in one or more of Defendants' membership programs and billed during the period of June 13, 2003 to the present.

34.     The EFTA Class and the RICO Class are referred to together in this complaint as the "Class." Excluded from the Class are Defendants; any entity in which any Defendant has a controlling interest; any Defendant's officers, directors, and employees; any Defendant's legal representatives, heirs, successors, and assigns; and any Judge to whom this case is assigned and his or her immediate family.

11

35.     **Numerosity of the Class—Fed. R. Civ. P. 23(a)(1).**  Class members are so numerous that their individual joinder herein is impracticable.  Plaintiff estimates that there are hundreds of thousands of members in the proposed Class.  The precise number of Class members and their addresses are unknown to Plaintiff, but can be obtained from information and records in Defendants' possession and control.

36.     **Existence and Predominance of Common Questions of Law and Fact—Fed. R. Civ. P. 23(a)(2), 23(b)(3).**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

a.     Whether Defendants obtained valid authorization from EFTA Class members to electronically withdraw funds from EFTA Class members' bank accounts for Defendants' membership programs;

b.     Whether the debits from EFTA Class members' accounts initiated by Defendants are "preauthorized electronic fund transfers" within the meaning of 15 U.S.C. § 1693a(9) and § 1693e;

c.     Whether Defendants had a duty under the EFTA to obtain EFTA Class members' authorization in writing or otherwise comply with the EFTA before debiting their accounts for preauthorized electronic fund transfers;

d.     Whether Defendants had a duty under the EFTA to provide EFTA Class members with a copy of their written authorization to initiate preauthorized electronic fund transfers from EFTA Class members' accounts;

12

e.      Whether Defendants complied with the requirements of the EFTA in connection with the preauthorized electronic fund transfers Defendants initiated from EFTA Class members' accounts;

f.      Whether Defendants violated the EFTA with respect to Plaintiff Wike and the EFTA Class members;

g.      Whether, during the relevant period, Influent was an "enterprise" as defined in 18 U.S.C. § 1961(4) that was engaged in, or the activities of which affected, interstate or foreign commerce;

h.      Whether Defendants' enrollment of consumers through Influent's telemarketing activities, as described herein, constituted a scheme or artifice to defraud or obtain money or property by means of false or fraudulent pretenses, representations, or promises, under 18 U.S.C. §§ 1341 and 1343;

i.      Whether Defendants, for the purpose of executing the foregoing scheme, used the mails as described in 18 U.S.C. § 1341;

j.      Whether Defendants committed mail fraud under 18 U.S.C. § 1341;

k.      Whether Defendants, for the purpose of executing the foregoing scheme, used the wires as described in 18 U.S.C. § 1343;

l.      Whether Defendants committed wire fraud under 18 U.S.C. § 1343;

m.      Whether Defendants have conducted, or participated, directly or indirectly, in the conduct of the affairs of the enterprise described above through a pattern of racketeering activity;

n.      Whether Defendants have violated 18 U.S.C. § 1962(c);

13

o.     Whether Defendants agreed to participate in the affairs of the enterprise described above through the commission of two or more predicate offenses by either of them;

p.     Whether Defendants have violated 18 U.S.C. § 1962(d);

q.     Whether Plaintiff and RICO Class members have suffered injury to their business or property by reason of Defendants' actions.

37.     **Typicality—Fed. R. Civ. P. 23(a)(3).** Plaintiff Wike's claims are typical of the claims of the EFTA Class members because, as with all other EFTA Class members, Defendants initiated electronic fund transfers from Plaintiff Wike's bank account without obtaining Plaintiff Wike's authorization in writing or providing her with a copy of that authorization. Plaintiff Wike's claims are typical of the claims of the RICO Class members in that Plaintiff Wike was enrolled in one of Defendants' membership programs via "outbound" or "call transfer" telemarketing by Influent and subjected to the alleged unlawful practices at issue in this matter.

38.     **Adequacy of Representation—Fed. R. Civ. P. 23(a)(4).** Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

39.     **Superiority—Fed. R. Civ. P. 23(b)(3).** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are relatively small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create

the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

40.     In the alternative, the Class may be certified under Rule 23(b)(2), because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## FIRST CAUSE OF ACTION
### (For Violations Of The Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 et seq.)
### (Against Vertrue, Inc. and Adaptive Marketing LLC)

41.     Plaintiff Wike, on behalf of herself and the EFTA Class, incorporates by reference each allegation set forth above as if fully set forth here, and further alleges against both Defendants as follows:

42.     The purpose of the EFTA is "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems." 15 U.S.C. § 1693. The primary objective of the EFTA "is the provision of individual consumer rights." Id.

43.     Plaintiff Wike maintained an "account" as that term is defined in 15 U.S.C. § 1693a(2).

44.     Plaintiff Wike is a "consumer" within the meaning of 15 U.S.C. § 1693a(5).

45.     Defendants engaged in "preauthorized electronic fund transfers," as that term is defined in 15 U.S.C. § 1693a(9), by debiting Plaintiff Wike's bank account on a monthly basis.

15

46.     The EFTA provides that "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."  15 U.S.C. § 1693e(a).

47.     As alleged herein, Defendants failed to comply with their duties under the EFTA because, during the EFTA Class period, Defendants initiated electronic fund transfers from Plaintiff Wike's account, without obtaining Plaintiff Wike's authorization in writing and without providing Plaintiff Wike with a copy of the authorization when made.  Defendants have similarly initiated electronic fund transfers from the accounts of EFTA Class members without obtaining their authorization in writing or providing them with a copy of the authorization when made.

48.     Defendants further failed to comply with the EFTA in that, insofar as Defendants purport to obtain consumer consent through telephonic tape-recording or electronic means, Defendants failed to comply with the requirements of the Electronic Signatures In Global And National Commerce Act, 15 U.S.C. § 7001 et seq., because Defendants did not obtain from Plaintiff Wike and Class members valid "electronic signatures" within the meaning of 15 U.S.C. § 7006(5), Defendants did not obtain valid consent from Plaintiff Wike and EFTA Class members to provide electronic copies to them of their purported authorizations, and Defendants did not provide to Plaintiff Wike and EFTA Class members any copies of their purported authorizations, in electronic form or otherwise.

49.     Furthermore, Defendants failed to maintain procedures reasonably adapted to avoid initiating electronic fund transfers from consumers' debit accounts when EFTA Class members misidentified their method of payment as a credit card and therefore Defendants were not entitled to debit Class members' accounts in reliance on EFTA Class members' misidentification.

16

50.     Accordingly, on behalf of herself and the proposed EFTA Class, Plaintiff Wike

seeks actual damages, statutory damages, costs of suit, including a reasonable attorneys' fee, and

such other relief that the Court deems appropriate, pursuant to 15 U.S.C. § 1693m.

## SECOND CAUSE OF ACTION
### (For Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)) (Against Vertrue, Inc. and Adaptive Marketing LLC)

51.     Plaintiff Wike, on behalf of herself and the RICO Class, incorporates by reference

each allegation set forth above as if fully set forth here, and further alleges against both

Defendants as follows:

52.     **"Person"- 18 U.S.C. §§ 1962(c), 1961(3).**  Defendants are "persons" as defined

in 18 U.S.C. § 1961(3).

53.     **"Enterprise"- 18 U.S.C. §§ 1962(c), 1961(4).**  Influent Inc., a corporation

organized under the laws of Delaware, constitutes an "enterprise" as defined in 18 U.S.C.

§ 1961(4).  Influent Inc.'s subsidiary Influent Philippines, Inc. is also a corporation and thus also

an "enterprise" as defined in 18 U.S.C. § 1961(4).  Both of these corporations are engaged in, or

their activities affect, interstate or foreign commerce.  As stated above, Influent Inc. and Influent

Philippines, Inc. are referred to together as "Influent."

54.     **"Pattern of Racketeering Activity" Consisting of Wire and Mail Fraud -**

**18 U.S.C. §§ 1962(c), 1961(1), 1961(5).**  Consumer demand for Defendants' membership

programs (and the discounts and other purported benefits offered by those programs) is

insufficient to generate any significant level of sales activity through the use of traditional

marketing techniques customarily employed by reputable businesses.  Because Defendants'

products are unable to compete in the marketplace on their own merits, Defendants are unable to

attract or retain customers unless they resort to deceptive, coercive, or misleading marketing

techniques. Defendants have developed a scheme to obtain consumer billing data and extract fees from them through the use of these techniques. The scheme involves misrepresentations, omissions, and other practices reasonably calculated to deceive persons of ordinary prudence and comprehension.

55. In furtherance of Defendants' scheme, between approximately March 2003 and September 2006, Defendants contracted with Influent to solicit consumers for Defendants' programs through outbound and call transfer telemarketing. Defendants and Influent, acting at Defendants' direction and on their behalf, engaged in deceptive practices in connection with the telemarketing activities, and engaged in acts of mail and wire fraud in furtherance of the overall scheme. Through these practices and acts, Defendants and Influent enrolled hundreds of thousands of consumers in Defendants' programs and charged them membership fees.

56. Plaintiff Wike's experience with Defendants and Influent is typical of such consumers. On February 13, 2005, Plaintiff Margaret Wike called AOL to resolve a technical issue. She spent much of the afternoon talking with four or five AOL representatives. At the end of the call, the AOL representative offered Ms. Wike a free $50 Wal-Mart gift card and transferred her to someone else. Ms. Wike thought she was being transferred to another AOL representative. In fact, she had been transferred to an Influent telemarketer in the Philippines.

57. Following a script, the Influent telemarketer said that she would provide Ms. Wike with more information "about your AOL member benefit." The telemarketer asked Ms. Wike how long she had been an AOL subscriber and then said, "Since you've been a valued member of AOL, we're giving you new promotion, the free $50 Wal-Mart Gift Card that you can use like cash at any Wal-Mart branches nationwide by trying out a program." The telemarketer told Ms. Wike that the program provided various discounts and that her card would be charged

$1 for a 30-day trial period, stating "Nothing more, nothing less, just $1 for 30 days." The telemarketer did not tell Ms. Wike that she would be automatically enrolled in the membership program and charged $19.95 a month unless she canceled the membership. Ms. Wike agreed to accept the $50 Wal-Mart gift card and to pay $1 for the 30-day trial period of the program. This first part of the call was not recorded.

58.     After obtaining Ms. Wike's consent to receive the gift card and be charged $1 for the 30-day trial period, the telemarketer started recording the call. During this "confirmation" stage of the sales pitch, the telemarketer asked Ms. Wike for the spelling of her name, her address, and her telephone number. The telemarketer then said, "In order to get the materials out to you Ma'am including the information about how to claim your free $50 Wal-Mart card and to charge the $1 trial fee Ms. Wike I need to know whether you will be using a MasterCard or a Visa—and you are using your Visa card for your bills correct?" The telemarketer then asked Ms. Wike "I need to know whether you will be using a MasterCard or a Visa – and you are using a Visa card for your bills, correct?" Ms. Wike, who thought she was still talking to an AOL representative, confirmed that she was using her Visa debit card to pay for her AOL account. When the telemarketer asked Ms. Wike to "verify" the card number and expiration date, Ms. Wike did so, because she believed AOL already had the information.

59.     After obtaining Ms. Wike's debit card information, the telemarketer mentioned the recurring fees for the first time, but spoke quickly and in an unclear fashion. The telemarketer also added phrases like "just to review" and "of course," to make it seem that she was not telling Ms. Wike anything new, and to obscure the information about recurring charges. Ms. Wike did not realize she was being signed up for a "Galleria" membership with a monthly

19

$19.95 charge. Ms. Wike believed she was agreeing only to receive the Wal-Mart gift card and to be charged at most a one-time $1 fee.

60. Influent transmitted Ms. Wike's name, address and debit card information to Defendants. Defendants added Ms. Wike to their database and, on or about February 14, 2005, arranged for the $19.95 recurring charge to be automatically deducted every month from the bank account associated with Ms. Wike's debit card, commencing one month later.

61. In late April 2005, while reviewing her March-to-April 2005 bank account statement, Ms. Wike discovered a charge of $19.95 to "Galleria USA." At that time, Ms. Wike did not question the charge because she mistakenly thought it was for an online service that she had ordered.

62. When the "Galleria USA" charge appeared again on her April-to-May 2005 bank account statement, Ms. Wike called the phone number listed next to the "Galleria USA" entry on her bank account statement to ask about the charge. The agent with whom Ms. Wike spoke said the charge was for a membership program that provided coupons. The agent said that the membership materials had been mailed to Ms. Wike and offered to re-send them. Ms. Wike said she had no interest in the program. She requested that her membership be cancelled and the money taken from her bank account refunded, both of which the agent agreed to do.

63. Ms. Wike did not receive the promised refund and Defendants continued to bill her for Galleria USA. As a result, Ms. Wike continued to call to complain. In approximately July or August 2005, Ms. Wike spoke with a Galleria USA agent who agreed to cancel Ms. Wike's account and refund the money improperly withdrawn from Ms. Wike's bank account. Defendants continued to bill Ms. Wike for Galleria USA and failed to provide any of the promised refunds.

20

64.     Ms. Wike called Galleria USA for at least the third time. Ms. Wike was put on hold and then disconnected. Ms. Wike called back immediately and was funneled into an automated system, and Ms. Wike succeeded in cancelling her purported Galleria USA membership. After she canceled, Ms. Wike called the Galleria USA phone number again to obtain a refund. Ms. Wike spoke with an agent who agreed to credit her bank account for two months worth of charges, but refused to transfer Ms. Wike to the agent's supervisor or provide identifying information for the supervisor. Ms. Wike was subsequently credited for two months of charges that Defendants had withdrawn from her account.

65.     In all, Ms. Wike was charged $1.00 in February 2005 and $19.95 per month from March through September 2005. Except for two months of charges that she was refunded, Defendants refused to honor Ms. Wike's demand for a refund of the money withdrawn from her bank account. After Ms. Wike filed her complaint in this matter, however, Defendants credited her bank account for the balance of the money they had improperly withdrawn.

66.     In addition, Ms. Wike never received the $50 Wal-Mart gift card that she had been promised at the outset. The Influent telemarketer who solicited Ms. Wike told her that she would receive a membership kit in the mail that "will contain all information you need to claim your free $50 Wal-Mart card." Ms. Wike does not recall receiving a membership kit. When Ms. Wike was deposed in this case, she was shown a copy of a "fulfillment" kit that had purportedly been sent to her, consisting of several folded pages of material concerning the Galleria USA program. The kit bore no outward indication that it contained information about the promised Wal-Mart gift card. The kit bore no outward indication that it had any connection with AOL, with whom Ms. Wike had been speaking before being transferred to the Influent

telemarketer. Ms. Wike testified that even if she had received the kit, she would not have recognized it as relevant, because she was expecting something from AOL.

67. Furthermore, instead of containing the Wal-Mart gift card, the fulfillment kit contained information, in an inconspicuous location, setting forth conditions that the consumer had to fulfill to obtain the card. The conditions required the following. The consumer had to fill out and mail in a request for a survey form and wait for the form to arrive. She then had to fill out and mail in the survey form. Defendants would supposedly send her the Wal-Mart gift card after receiving her completed survey. Ms. Wike was required to maintain her membership in Galleria USA at the time Defendants received her completed survey to be eligible for the gift card. Thus, even if Ms. Wike recognized the kit as something related to her solicitation by the Influent telemarketer, opened and reviewed the material, and filled out the requisite forms, by the time she received the Wal-Mart gift card, the value of the card would have been exceeded by the membership fees she paid.

68. The Influent telemarketer who solicited Ms. Wike did not disclose that she would have to fulfill a series of conditions to receive the Wal-Mart gift card, what those conditions were, the amount of time it would likely take to fulfill the conditions and receive the card, or that the amount in membership fees she would have to pay pending receipt of the card would exceed its value.

69. Defendants also benefited from the failure of consumers such as Ms. Wike to recognize the relevance of the fulfillment kits in the first place. Defendants designed the kits to look like junk mail and be summarily disposed of by the consumer. By failing to recognize the kits, consumers were not alerted that they were enrolled in a membership that would result in periodic charges, nor were they alerted to the conditions they would need to fulfill to obtain the

22

promised Wal-Mart gift card or other premium offered at the outset of the telemarketing solicitation. The fewer the consumers who fulfilled the conditions for obtaining the premiums, the lower the costs Defendants incurred in providing the items. Defendants have admitted in this litigation that less than two percent of consumers who were enrolled in Defendants' membership programs through call transfer telemarketing received the premium within the trial period. Of those consumers who remained members of the program after the trial period, less than nine percent ever received the promised premium.

70. Reflecting a similar strategy of offering consumers a benefit to keep them on the hook for membership charges, Defendants contend that during one of Ms. Wike's calls to complain, the agent offered her a $25 gas card or coupon as an inducement to remain a member of Galleria USA. The practice of offering coupons as an inducement to continue membership was itself deceptive. Instead of sending the consumer the coupon, Defendants instead sent a form to claim the coupon. To receive the coupon, the consumer would have to wait for the form to arrive, complete and mail back the form, and "allow 4-6 weeks for processing" (as stated on the form), while remaining a member of Defendants' program throughout that time.

71. Thus, the consumer would be charged monthly membership fees during that period exceeding the value of the coupon. If, on the other hand, the consumer decided to terminate membership immediately upon receiving the form and discovering that he or she would receive the coupon only after a lengthy process, the person would have already entered the next billing cycle and been charged a monthly fee by Defendants. Furthermore, Defendants sent the coupon form even to consumers who did not accept the coupon offer, so that Defendants could later claim the consumers accepted the offer and thus agreed to continue membership.

72.    As alleged above, the Influent telemarketer who solicited Ms. Wike purposely did not record the first part of the sales pitch, during which the telmarketer offered her the Wal-Mart gift card without mentioning recurring fees. The telemarketer recorded only the confirmation phase, during which she hurriedly mentioned the fees for the first time, after obtaining Ms. Wike's debit card information.

73.    According to the "official" scripts displayed on the computer screens of Influent telemarketers (including the one who solicited Ms. Wike), the telemarketers were to inform consumers of periodic charges before the "confirmation" phase, but they, their managers, Influent, and Defendants understood that consumers would not provide their billing information if they knew the actual terms. Therefore, as instructed by Influent managers, the telemarketers (including the one who solicited Ms. Wike) did not follow the scripts on their screens, and instead used alternative hard-copy scripts, provided by the managers, that did not disclose the recurring fees until the confirmation phase of the call. Defendants would then claim (and continue to claim) that consumers' consent to recurring charges could be shown by audio recordings of the "confirmations," coupled with the "official" scripts that the telemarketers supposedly followed. Defendants have made precisely this claim with respect to Ms. Wike in this action.

74.    Occasionally, telemarketers would be informed beforehand that a call would be recorded in its entirety, and they then followed the "official" scripts. The ostensible purpose of these recordings was for "quality assurance," but the actual purpose was to create a false record of what was communicated during calls to defend against consumer and regulatory complaints.

75.    The practices to which Ms. Wike was subjected, as alleged above, were reasonably calculated to deceive persons of ordinary prudence and comprehension such as

24

Ms. Wike, and did in fact deceive Ms. Wike as to, among other things, the terms and conditions governing her receipt of the Wal-Mart gift card; her enrollment in Defendants' Galleria program; and her being charged recurring membership fees for the program.

76.     Defendants have engaged in the same, or materially the same, practices as those described above with respect to hundreds of thousands of consumers so as to enroll them in Defendants' membership programs and charge recurring fees to their credit or debit card accounts.

77.     The practices alleged above constitute mail and wire fraud, as they constitute use of the mails and wires for the purpose of executing a scheme or artifice to defraud or obtain money or property by means of false or fraudulent pretenses, representations, or promises.  Such acts of mail and wire fraud include the telephone solicitations of consumers by Influent telemarketers acting on Defendants' behalf; the telemarketer's electronic transmission of the consumers' credit or debit card information to Defendants; Defendants' mailing of fulfillment kits to the consumers; and Defendants' charging of  membership fees to the consumers' credit or debit card accounts.

78.     Furthermore, the acts of wire and mail fraud alleged above constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5).

79.     **"Conduct or Participate, Directly or Indirectly, in the Conduct of the Enterprise's Affairs" - 18 U.S.C. § 1962(c).**  Defendants have directly or indirectly conducted or participated in the conduct of Influent's affairs through a pattern of racketeering activity by causing it to carry out the telephone solicitations and engage in the other acts of mail and wire fraud and practices described above.

25

80.     Defendants had and exercised control over Influent so as to cause it to engage in the telephone solicitations and other practices described above.  Defendants had and exercised such control by entering into contracts with Influent that required it to solicit consumers for Defendants' membership programs using methods approved by Defendants; designing the membership programs and premiums to be offered to consumers by Influent; overseeing and monitoring Influent's solicitation and enrollment of consumers in the programs and the practices used by Influent in connection therewith, including through site visits to Influent's facilities; and obtaining and retaining the monetary benefits resulting from Influent's practices, i.e., the membership charges extracted from consumers enrolled by Influent.

81.     Defendants knew at all relevant times that there was no meaningful consumer demand for their membership programs.  For example, according to Defendants themselves, of the 112,586 consumers who were enrolled in the Galleria program in 2004 and 2005 as a result of their calls being transferred from AOL to a telemarketer, only about five percent, or approximately 5,900, remained enrolled in that program as of December 31, 2005.  Defendants knew that Influent would be unable to enroll significant numbers of consumers in Defendants' membership programs unless it used deceptive or coercive practices, and set enrollment targets for Influent that Defendants knew could not be met without Influent's use of such practices.

82.     Defendants further directly or indirectly conducted or participated in the conduct of Influent's affairs through a pattern of racketeering activity by directly committing acts of wire and mail fraud themselves.  In furtherance of the scheme by which Influent enrolled hundreds of thousands of consumers in Defendants' membership programs, Defendants, among other things, used the mails to send fulfillment kits to such consumers; used the wires to receive consumers' credit or debit card information so that Defendants could charge them recurring fees; used the

26

wires to charge consumers' credit and debit cards; and used the wires to engage in practices that prevented consumers from canceling the memberships.

83. **Injury to Business or Property--- 18 U.S.C. § 1964(c).** As a direct and proximate result of Defendants' violations of 18 U.S.C. §1962(c), Ms. Wike and the RICO Class have suffered injury in fact and lost money and/or property, including money unlawfully, unfairly, and deceptively charged against and taken from their credit and debit card accounts by Defendants.

84. Ms. Wike was injured by reason of the scheme described above in that she was targeted by the scheme and solicited by an Influent telemarketer acting on behalf of Defendants; subjected to one or more of the practices alleged above; and charged one or more recurring fees for one of Defendants' membership programs. All other RICO Class members were similarly targeted by the scheme and solicited by Influent telemarketers; subjected to one or more of the practices alleged above; and charged recurring fees for Defendants' membership programs.

85. The injuries suffered by Ms. Wike and the other RICO Class members were the direct result of Defendants' actions. The injuries were a substantial and foreseeable consequence of Defendants' scheme, and were a result that Defendants intended and desired. There are no independent factors that account for the injuries; there is no risk of duplicative recoveries by aggrieved persons removed at different levels of injury from the RICO violations; and no more immediate victim is better situated to sue than a person such as Ms. Wike, who was deliberately drawn by Defendants into their scheme when she called AOL customer service and was transferred to an Influent telemarketer.

86. Furthermore, Ms. Wike herself was the subject of two or more predicate acts of wire or mail fraud committed in furtherance of Defendants' scheme: (1) the February 2005

27

telephone solicitation of Ms. Wike by an Influent telemarketer in the Philippines; (2) the telemarketer's electronic transmission of Ms. Wike's debit card information to Defendants; (3) Defendants' arrangement for the recurring membership charge to be automatically deducted from the bank account associated with Ms. Wike's debit card; (4) Defendants' purported mailing of a fulfillment kit to Ms. Wike later in February 2005; (5) each transfer of a monthly membership charge from Ms. Wike's account; and (6) Ms. Wike's series of telephone calls to Defendants after April 2005, during which she unsuccessfully sought cancellation of her Galleria membership and a full refund of all fees taken from her debit card account.

87.     Dates and other details of similar acts of wire and mail fraud to which other RICO Class members have been subjected are not known to Plaintiff but are within Defendants' possession, and Plaintiff can allege them by amendment if necessary after further discovery. Given the way the scheme functions, however, each other RICO Class member was necessarily subjected to at least three acts of wire fraud:  (1) a telephone solicitation by an Influent telemarketer acting on behalf of Defendants; (2) the telemarketer's electronic transmission of the RICO Class member's credit or debit card information to Defendants; and (3) Defendants' charge of a membership fee to the person's credit card account or deduction of a membership fee from the person's debit card account.

88.     Accordingly, Ms. Wike, on behalf of herself and the RICO Class, is entitled to and seeks statutory and treble damages, costs of suit and attorneys' fees, injunctive and declaratory relief, and any such other and further relief as the Court deems proper, pursuant to 18 U.S.C. § 1964.

## THIRD CAUSE OF ACTION
### (For Violations of RICO, 18 U.S.C. § 1962(d))
### (Against Vertrue, Inc. and Adaptive Marketing LLC)

89.     Plaintiff Wike, on behalf of herself and the RICO Class, incorporates by reference each allegation set forth above as if fully set forth here, and further alleges against both Defendants as follows:

90.     **"Person"- 18 U.S.C. §§ 1962(d), 1961(3).** Defendants Vertrue, Inc. and Adaptive Marketing LLC are "persons" as defined in 18 U.S.C. § 1961(3).

91.     **"Conspire to Violate Any of the Provisions of Subsection (a), (b), or (c)"-- 18 U.S.C. § 1962(d).** Defendants agreed to conduct or participate in the conduct of the affairs of the enterprise described above through the commission of two or more predicate offenses by either of them, or by directing the enterprise to commit two or more predicate offenses. In particular, they agreed to commit, and agreed to direct Influent to commit, wire fraud and mail fraud hundreds of thousands of times, as described above, and in fact did so.

92.     Therefore, Defendants conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). Accordingly, Ms. Wike, on behalf of herself and the RICO Class, is entitled to and seeks statutory and treble damages, costs of suit and attorneys' fees, injunctive and declaratory relief, and any such other and further relief as the Court deems proper, pursuant to 18 U.S.C. § 1964.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment as follows:

a.      For an order certifying the proposed EFTA Class and RICO Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and her counsel of record to represent the proposed EFTA Class and RICO Class;

b.      For an order enjoining Defendants' wrongful conduct;

c.      For an order awarding Plaintiff and Class members actual and statutory damages, and interest thereon, pursuant to 15 U.S.C. §1693m;

d.      For an order awarding Plaintiff and the Class compensatory and consequential damages in an amount to be proven at trial, together with interest thereon;

e.      For an order awarding Plaintiff and the Class treble damages;

f.      For an order awarding Plaintiff and the Class attorneys' fees and costs of suit, including expert witness fees;

g.      For an order awarding Plaintiff and the Class pre-judgment and post-judgment interest;

h.      For an order awarding Plaintiff and the Class such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.


Dated: _____

Respectfully submitted,


By: _____

Daniel C. Girard (admitted *pro hac vice*)
A. J. De Bartolomeo (admitted *pro hac vice*)
Amanda M. Steiner (admitted *pro hac vice*)
Christina H.C. Sharp (admitted *pro hac vice*)
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

Gerald E. Martin (# 20193)
**BARRETT, JOHNSTON & PARSLEY**
217 Second Avenue North
Nashville, Tennessee 37201
Telephone:  (615) 244-2202
Facsimile:  (615) 252-3798

Attorneys for Individual and
Representative Plaintiff