UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MARGARET WIKE, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:06-00204 Judge Campbell |
| VERTRUE, INC. f/k/a MEMBERWORKS, INC.; ADAPTIVE MARKETING LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM

Pending before the Court is Plaintiff's Motion for Class Certification of her Electronic Fund Transfer Act ("EFTA") claim (Docket No. 375). Plaintiff has filed a Memorandum in support of that Motion (Docket No. 377), Defendants Vertrue, Inc. and Adaptive Marketing, LLC have filed a response in opposition (Docket No. 407), and Plaintiff has filed a reply (Docket No. 414). On September 9, 2010, the Court held a hearing on Plaintiff's Motion and the matter is now ripe for ruling.

### I. GENERAL BACKGROUND

For present purposes, the factual allegations need only be briefly summarized in order to place the parties' arguments in context. Those allegations will be expanded upon where necessary for purposes of the legal analysis applicable to Plaintiff's request for class certification.

Defendants market membership programs under names like Connections, Essentials, Galleria USA, Homeworks Plus, Passport to Fun, Shopping Essentials, and Value Max which purportedly entitle members to discounts on consumer goods and services. Defendants charge consumers

1

recurring fees for the membership programs which, depending on the program, range from $1 to $19.95 monthly, or from $169.95 to $199.95 annually. To entice enrollment into the programs, consumers are often offered premiums such as a "free" gift card to establishments like Wal-Mart.

While Defendants solicit consumers through various methods, including mass mailings, internet pop-up and banner ads, and telemarketing, only Defendants' telemarketing practices are at issue in this case. Generally, there are three types of telemarketing: outbound, where the telemarketer cold-calls a customer; inbound, where a solicitation is made when a customer calls a business; and call transfer (a variation of inbound telemarketing), where a call is transferred to the telemarketer after the customer calls a business. At least with respect to the outbound and call transfer telemarketing, Defendants paired with a marketing partner, such as America Online ("AOL") or Greyhound, which was compensated for participating in the promotion of Defendants' membership programs. Under all three approaches, individual telemarketers received commissions for each successful enrollment.

The sales pitches for the membership programs were based upon scripts devised by Defendants, which Plaintiff claims were designed to confuse and deceive customers. While the scripts were drafted by the Defendants, where Defendants paired with a marketing partner, the scripts were subject to approval by that partner.

Because of the large number of membership partners and the various campaigns, Defendants maintain that there were literally hundreds (if not thousands) of scripts which were in existence over the years. Moreover, the telemarketers utilized by Defendants did not always follow the script verbatim as they were supposed to do.

Plaintiff insists that while there may have been many scripts used to solicit memberships in Defendants' programs, and while the scripts may not always have been followed, the actual differences in the scripts were minimal, and any variation from the scripted language is not germane

2

to the legal issues presented by her motion for class certification. Only the end portion of the call between the telemarketer and consumer was recorded, and, Plaintiff asserts, this is what matters because Defendants point to the taped portion of the call as the consumer's authorization to charge his or her account the recurring fees for enrollment in the membership programs.

Turning to the specifics of Plaintiff's involvement with Defendants' programs, Plaintiff was enrolled in Defendants' Galleria Membership program after she called AOL on February 13, 2005 and her call was transferred to Influent, Inc. ("Influent"), a telemarketing service provider used by Defendants. Plaintiff claims that while she was interested in a promised "free" $50.00 Wal-Mart gift card, she was effectively conned into giving the Influent telemarketer her debit card and enrolled in the Galleria Membership program. Defendants claim that the Influent telemarketer did not follow the script and that, in any event, Plaintiff voluntarily agreed to the Galleria Membership as evidenced by her saying, "okay" after the sales pitch, and her telling the telemarketer, "I'm not interested in that one" when the telemarketer tried to enroll her in another membership program called Simple Escapes.

Regardless of whether Plaintiff voluntarily became a Galleria member, she claims that her enrollment led to months of agony in trying to disenroll from the program and receive a refund of the $19.95 which had been debited monthly from her bank account. She claims she is not alone and that thousands of others have been subjected to the allegedly deceptive sales tactics of Defendants.

In fact, Defendants' practices have spawned several lawsuits, including, most notably, a Multi-District Litigation ("MDL") case pending in the United States District Court for the Northern District of Ohio. There, thirteen putative class actions were consolidated for pretrial purposes and, after transfer, a consolidated amended complaint was filed. The transferee court described the basic allegations in that consolidated complaint as follows:

> Generally speaking, the complaint alleges that defendants engaged in a

3

Case 3:06-cv-00204   Document 434   Filed 09/15/10   Page 3 of 18 PageID #: 13168

practice of making unlawful charges to plaintiffs' and the class members' credit and/or debit cards after plaintiffs called to purchase a product sold on television. This product is alleged to be the "bait" product. According to the complaint, after obtaining credit or debit card information from plaintiff to purchase a product, the telemarketer reads a prepared script in an effort to enroll the caller in a "membership" program offered by Vertrue. At the time of the alleged misconduct, Vertrue operated as MemberWorks, Incorporated ("MWI"). MWI prepared the script and paid the telemarketers and the "bait" product suppliers a fee for each consumer enrolled in the membership program. According to the complaint, the script deceptively informs the purchaser that "free" materials will be sent in the mail. Thereafter, upon receipt of the credit or debit card information, MWI mailed a membership card to the purchaser and placed a recurring annual charge of $60-$170 on the credit or debit card. This charge renewed annually unless the purchaser called to cancel the membership. In the event a particular purchaser discovered the charge, MWI would "reverse" the charge.

In Re Vertrue Marketing and Sales Practices, 2010 WL 1539976 at *2 (N.D. Ohio 2010).[1] Additionally, in State of Iowa *et al.* v. Vertrue Inc. *et al.*, Equity No. 53486 (Polk Dist. Ct., March 18, 2010), an Iowa state district judge, in a 62-page opinion, held that Defendants' marketing of membership programs through channels including direct mail, internet, and inbound and outbound telemarketing violated such things as Iowa's "Buying Club Membership Law," the "Iowa Consumer Fraud Act," and the "Older Iowans Law." (Docket No. 383-1).

In this case, Plaintiff seeks to represent a class of all consumers who used a debit card to enroll in any of Defendants' membership programs via telemarketing from March 14, 2005 to the present. At oral argument on the motion for class certification, Plaintiff's counsel represented that this class would not overlap or conflict with any of the other pending cases against Defendants, and counsel for Defendants did not argue otherwise.

## II. **STANDARDS GOVERNING CLASS CERTIFICATION**

---

[1]The MDL Judicial Panel conditionally transferred this case to the Northern District of Ohio. However, at Defendants' request, the transfer order was vacated because this action involves Defendants' conduct beginning in 2005, whereas the MDL litigation "focus[es] primarily, if perhaps not exclusively, on pre-2003 conduct," and because the MDL litigation was in its infancy, whereas this case "is far more advanced." (Docket No. 326 at 1).

"The trial court has broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23." In re Am. Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996). Under Rule 23, a party seeking class certification must first demonstrate that she meets the requirements set forth in Federal Rule of Civil Procedure 23(a), that is, (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P 23(a). Additionally, the prospective class representative must show the action falls within one of the types of class actions described in Rule 23(b). Here, Plaintiff seeks certification under Rule 23(b)(3) and thus the Court may certify the class action if it "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### III. LEGAL ANALYSIS

Plaintiff seeks class certification on her remaining EFTA claim. After a general overview of EFTA, the Court will consider Plaintiff's request in light of the factors identified in Fed. R. Civ. P. 23.

EFTA was enacted as part of the comprehensive Consumer Credit Protection Act ("CCPA") and "protects individual consumer rights by 'provid[ing] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems.'" Clemmer v. Key Bank Nat. Ass'n, 539 F.3d 349, 351 (6th Cir. 2008)(quoting, 15 U.S.C. § 1693(b)). Since EFTA is a remedial statute, it is accorded "'a broad, liberal construction in favor of the consumer.'" Id. (quoting, Begala v. PNC Bank, Ohio, Nat'l Ass'n, 163 F.3d 948, 950 (6th Cir.1998)).

The implementing regulations for EFTA, which are known as "Regulation E" and codified at 12 C.F.R. section 205 et seq., state that "[p]reauthorized electronic fund transfers from a

5

consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer." 12 C.F.R. § 205.10(b). The regulations further provide that "[t]he person that obtains the authorization shall provide a copy to the consumer." Id.

Importantly, because EFTA deals with electronic funds transferred directly from bank accounts, it applies to debit cards, but not credit cards. See, 15 U.S.C. § 1693(a)(6)(defining electronic fund transfer); In re Vistaprint Corp. Mktg. and Sales Practices, 2009 WL 2884727 at *8 (S.D. Tex. 2009)(EFTA does not apply to transactions involving credit cards); Sanford v. Memberworks, Inc., 2008 WL 4482159 at *2 (S.D. Cal. 2008)(same). EFTA allows recovery for actual damages, statutory damages for technical violations, and attorney's fees and costs. 15 U.S.C. § 1693m(a).

In this case, Plaintiff claims that Defendants initiated "preauthorized electronic fund transfers" by charging her Visa debit card allegedly without first having obtained a "writing signed or similarly authenticated" which authorized the transfers as required by EFTA, and did not have a procedure in place reasonably adapted to avoid processing a debit card transaction as a credit card transaction. She also claims that Defendants violated EFTA by failing to provide her with a copy of her authorization. Because such allegedly wrongful conduct by Defendants was widespread, she seeks to represent a class of similarly situated consumers. Specifically, she proposes the following class:

> All persons who were enrolled in one or more of Defendants' membership programs via telemarketing and from whose accounts Defendants initiated the first preauthorized electronic fund transfer at any time during the period of March 14, 2005 to the present.

(Docket No. 414 at 21).

For the reasons set forth below, the Court finds that Plaintiff has marshaled sufficient evidence to support certification of a class on her EFTA claim. However, the proposed class may be

6

defined too broadly in terms of its duration by continuing "to the present." Plaintiff's counsel conceded at oral argument that Defendants may have stopped the practices about which Plaintiff complains and indicated that, with cooperation from Defendants, the parties could readily determine a more appropriate end date to the class definition.[2]

## A. Fed. R. Civ. P. 23(a) Factors

### (1) Numerosity – Fed. R. Civ. P. 23(a)(1)

The numerosity requirement provides that the class must be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). The Sixth Circuit has "observed that '[t]here is no strict numerical test for determining impracticability of joinder.'" Golden v. City of Columbus, 404 F.3d 950, 965 (6th Cir. 2005)(citation omitted). "Rather, '[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations.'" In re Am. Med. Sys., 75 F.3d at 1079 (quoting, General Tel. Co. v . EEOC, 446 U.S. 318, 330 (1980)). Nevertheless, "[w]hen class size reaches substantial proportions, . . . the impracticability requirement is usually satisfied by the numbers alone." Id. Thus, "the sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." Bacon v. Honda of Amer. Mfg., Inc., 370 F.3d 565, 570 (6th Cir. 2004).

The parties are in agreement that the size of the proposed class is substantial. Indeed, at oral argument, counsel for Defendants conceded that approximately 1,700 out of "several million" enrolled in Defendants' membership programs between March 2005 and February 2006 utilizing a debit card, and that there may have been others whose debit cards were processed as if credit cards.

---

[2]Of course, the scope of the class is subject to change and the class may be expanded (or narrowed) if discovery (which thus far has been limited on the EFTA claim) warrants modification of the scope of the class. See, Fed. R. Civ. P. 23(c)(1)(c).

7

Accordingly, the Court finds that the numerosity requirement has been satisfied.

### (2) Typicality and Commonality – Fed. R. Civ. P. 23(a)(2) & (3)

Typicality, as the word suggests, requires that the claims or defenses of the class representatives be typical of the claims or defenses of the class members. Fed.R.Civ.P. 23(a)(3). To meet the typicality requirement, Plaintiff "must show that [her] 'injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff.'" Id. (citation omitted). "'Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claim of the other class members, and if his or her claims are based on the same legal theory.'" In re Am. Med. Sys., 75 F.3d at 1082 (quoting, 1 Herbert B. Newberg & Alba Conte, NEWBERG ON CLASS ACTION, § 3-13, at 3-76 (3d ed. 1992)).

Commonality requires that there be a common question of law or fact shared by the class. Fed.R.Civ.P. 23(a)(2). "The commonality test is qualitative rather than quantitative, that is, "'there need be only a single issue common to all members of the class." In re Am. Med. Sys., 75 F.3d at 1080 (citation omitted). Nevertheless, common questions can be too abstract or generalized and therefore there must be "a common issue the resolution of which will advance the litigation." Sprague v. General Motors Corp., 133 F.3d 388, 397 (6th Cir.1998).

The commonality and typicality requirements often "tend to merge," Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982), and "'similar considerations animate analysis' of both." Brown v. Kelly, 609 F.3d 467, 475 (2nd Cir. 2010)(citation omitted). "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class [members'] claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Falcon, 457 U.S. at 157 n.13. As such, a court may consider typicality and commonality in tandem. Ball v. Union

Carbide, 385 F.3d 713, 729 (6th Cir. 2004).

In support of her request for class certification, Plaintiff has submitted three transfer call scripts (two for AOL, and one for Greyhound),[3] a copy of the fulfillment kit which was sent to those AOL customers who enrolled in a membership club,[4] and declarations from six former Influent telemarketers, all of whom were employed as of February 2005. (Docket Nos. 422-16 to 422-21).

Each telemarketer describes his or her involvement with selling Galleria USA and Simple Escapes memberships through the AOL-Smart Transfer program. Generally, the declarations are consistent and show the following.

Upon transfer of a call, the telemarketers were trained to try to develop rapport with the customer. The customer was told of the supposed benefits of membership (some of which was allegedly false), and that he or she would be charged only $1 for a thirty day membership. At this point, no reference was made to the $19.95 monthly fee after the trial period, even though the scripts called for informing the customers about the recurring fee. The telemarketers state that their supervisors knew about this omission and condoned it. If the customer appeared interested in the trial membership, only then would the telemarketer start recording the call.

During the recorded portion of the call, the telemarketer would begin by reviewing the customer's information, such as name, address, phone number, and bank card information. After

---

[3] These same scripts were also filed by Defendants, as well as two outbound and one inbound scripts. (Docket Nos. 408-1 to 408-6).

[4] Plaintiff asserts that the fulfillment kit looks like junk mail and she is not sure that she even received it. Plaintiff also asserts that the fulfillment kit does not include a copy of the authorization.
In any event, the fulfillment kit which has been placed in the record is a folded-over, self-mailer which, for the first several pages, touts the supposed savings that members can expect. The mailer also includes a form for receipt of the "free" Wal-Mart gift card which indicates that the card would be sent after the customer completes a survey. On the last page, in much smaller font, is a lengthy "Terms of Membership and Membership Agreement." (Docket No. 423-10).

9

receipt of this information, the telemarketer would then, slowly and clearly, remind the customer about the $1 fee, and then, speaking quickly and unclearly, would inform the customer about the $19.95 fee. Those that enrolled in a membership program would not be sent the promised "free" gift card until after the 30-day trial period expired, but, even then, the customer had to fill out a survey in order to receive the card.

The scenario described by the telemarketers and as evidenced by the scripts is the same as that alleged by Plaintiff which led to her enrollment in the Galleria membership program via a call transfer from AOL. In this respect, her claim appears typical not only of other AOL customers who ended up in one of Defendants' membership programs, but also of other customers who called a business for one purpose and had their call transferred to telemarketers employed by Defendants under the guise that they would be entitled to a "free" gift card or some other benefit.

At this point, the bulk of the evidence focuses almost entirely on Defendants' call transfer practices and Plaintiff's experience was in that genre of telemarketing. However, the Third Amended Complaint sets forth allegations suggesting that Defendants utilized the same type of tactics in relation to the authorization/copy procedure for all three types of telemarketing (regardless of the program), and Defendants have offered nothing which suggests otherwise. See, Reeb v. Ohio Dept. of Rehab. and Corr., 81 Fed.Appx. 550, 555 (6th Cir. 2003)(citing, In re Am. Med. Sys., 75 F.3d at 1079))(allegations in the complaint must be accepted as true, although the court should look beyond the pleadings in seeking information relevant to the class certification question). In fact, at oral argument, defense counsel conceded that those who had calls transferred and enrolled in a membership program were basically similarly situated regardless of the particular program into which they enrolled. Counsel also conceded that the "concept" of recording a customer's certification was standard and "remained in place since the outset" because that was what was required by EFTA.

10

This is not to say that Defendants agree that Plaintiff's claims are typical or common. Quite the contrary, Defendants argue there were countless scripts utilized, the scripts were not always followed, and the fulfilment kits "evolved" over time. While all of that may be true, it is not outcome determinative on the class certification issue and whether Plaintiff's claims are typical and common.

"In order to find typicality and commonality, the precise nature of the various claims must be examined." Reeb v. Ohio Dep't. of Rehab. & Corr., 435 F.3d 639, 644 (6th Cir. 2006). Further, "[v]ariations in the circumstances of class members are acceptable, as long as they have at least one issue in common." Bacon, 370 F.3d at 570.

Here, Plaintiff's claims are essentially two-fold – Defendants violated EFTA by (1) relying on the recorded conversation as the authentication, and (2) sending fulfillment kits to serve as the copy of that authorization. These are issues common to all members of the proposed class. That the scripts may have been different or not followed does not undercut the legal question of whether a recording amounted to "a writing signed or similarly authenticated by the consumer." 12 C.F.R. § 205. 10(b). Likewise, merely suggesting that there may have been an evolution in the fulfillment kits does not resolve the legal question of whether, by sending a kit, defendants "provide[d] a copy [of the authorization] to the consumer." Id.

### 3. Adequacy of Representation – Fed. R. Civ. P. 23(a)(4)

Rule 23(a)(4) provides that an individual may sue as a class representative only if he or she "will fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4). The Sixth Circuit has described this factor, in conjunction with the related class counsel factor under Fed. R. Civ. P. 23(g)(1)(c), as follows:

> Class representatives are adequate when it "appear[s] that [they] will vigorously prosecute the interests of the class through qualified counsel" . . . which usually will be the case if the representatives are "part of the class and possess the same interest

> and suffer the same injury as the class members[.]" Because named class members must act through class counsel, adequacy of representation turns in part on "the competency of class counsel" and in part on the absence of "conflicts of interest."

Int'l Union, United Auto. v. General Motors Corp., 497 F.3d 615, 626 (6th Cir. 2007)(internal citation omitted).

Turning first to the adequacy of counsel, Plaintiff has submitted the resumes of the Girard Gibbs LLP, and the Barrett, Johnston & Parsley, LLC law firms, both of which represent her in this action. (Docket Nos. 381-23 & 381-24). The resumes for both firms indicate extensive experience in the handling of class actions. Moreover, the record reflects that those firms have spent considerable time on this case and have vigorously pursued Plaintiff's claims, both in this Court and on appeal. See, Wike v. Vertrue, Inc., 566 F.3d 590 (6th Cir. 2009). Defendants do not suggest that either firm would be incapable of handling this litigation in a class action context. Accordingly, the Court finds that class counsel is adequate.

As for Plaintiff, Defendants challenge her ability to adequately represent the class because, in their view, she is simply not credible as evidenced by the allegedly inconsistent positions she has taken in this litigation. In this regard, Defendants argue that Plaintiff has taken contradictory factual stances about such varied things as whether she agreed to the Galleria offer, the content of the telemarketing solicitation, why she was offered a $50 Wal-Mart gift card, whether she enrolled in another membership program called Privacy Matters, and her efforts to cancel her Galleria membership.

Courts have not reached an accord as to whether a class representative's credibility is a proper consideration in making the adequacy determination. Some courts have indicated that credibility is a concern. See, Karnuth v. Rodale, Inc., 2005 WL 747251 at *3 (E.D. Pa. 2005)(where a class representative's credibility is in serious question, class certification may be denied); Savino v.

12

Computer Credit, Inc., 173 F.R.D. 346, 350 (E.D.N.Y. 1997)("courts are free to consider the honesty and trustworthiness of the named plaintiff when determining his or her suitability as a class representative"). Others have indicated it is not. See, Streeter v. Sheriff of Cook County, 256 F.R.D. 609, 613 (N.D. Ill. 2009)(citation omitted)("credibility is not a requirement of a class representative, and whether or not a plaintiff is credible is irrelevant to that person's ability to be a class representative"); Cervantes v. Sugar Creek Packing Co., 210 F.R.D. 611, 626 (S.D. Ohio 2002)("Defendant may be correct that plaintiffs' testimony is not foolproof, but this goes to the merits of the class claims and not to the adequacy of plaintiffs as representatives"). Still others have indicated that credibility is a factor to be considered when it is tied to the claims in the lawsuit. Gooch v. Life Investors Ins. Co. of Amer., 264 F.R.D. 340, 349 (M.D. Tenn. 2009)(collecting cases).

In this case, the Court concludes that Plaintiff has shown she will be an adequate representative. She has demonstrated her willingness to prosecute this action during the 4½ years that the case has been pending. Even if it may be said that Plaintiff has equivocated on some issues, those issues are tangential to the two overarching issues in this case. Regardless of the positions Plaintiff may have taken in the past, either the recordings satisfied the "similarly authenticated" requirement for a writing, or they did not; and either the fulfillment kit constituted a "copy" of such writing, or it did not.

### B. Fed. R. Civ. P. 23(b) Factors

To certify a class under Rule 23(b)(3), the court must find that questions of law or fact predominate over questions peculiar to individual members of the proposed class. The Court must also find a class action is superior to other methods of resolving the litigation. Fed.R.Civ.P. 23(b)(3).

**1. Predominance**

The predominance requirement of Rule 23(b)(3) is similar to the typicality and commonality

13

Case 3:06-cv-00204   Document 434   Filed 09/15/10   Page 13 of 18 PageID #: 13178

requirements of Rule 23(a). Ball, 385 F.3d at 728. "While Rule 23(a) asks whether there are typical issues common to the class, Rule 23(b)(3) asks whether these common questions predominate." Wolin v. Jaguar Land Rover No, Amer., Inc., ___ F.3d ___, 2010 WL 32222091 at *3 (9th Cir. 2010). "Though there is substantial overlap between the two tests, the 23(b)(3) test is 'far more demanding,' . . . and asks 'whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" Id. (quoting, Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997)).

"The predominance requirement is met if th[e] common question is at the heart of the litigation." Powers v. Hamilton County Pub. Defender Comm'n, 501 F.3d 592, 619 (6th Cir. 2007). Therefore, "to satisfy the predominance requirement in Rule 23(b)(3), 'a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'" Beattie v. Century Tel., Inc., 511 F.3d 554, 564 (6th Cir. 2007).

Here, and as has already been indicated, Plaintiff has identified two common issues which are at the heart of the litigation: whether Defendants obtained written authorizations (or an equivalent) from consumers before making electronic fund transfers from their debit accounts, and whether Defendants provided consumers with a copy of the written authorization. Defendants argue that those are really subsidiary issues and that other issues will predominate. Based on the record as it is now presented, the Court disagrees.

Defendants note that even Plaintiff admits that the telemarketers did not make uniform oral presentations. Therefore, whether Defendants complied with EFTA is dependent in each case on the oral interaction between the consumer and telemarketer, and particularly what the consumer may have said to the telemarketer regarding the card to be used for enrollment. Defendants contend if the customer was asked to give a credit card but gave a debit card, or was simply asked to give a "card"

14

yet did not identify it as a debit card, there may be no EFTA violation. However, subsumed in this argument is the notion that it is the consumer's responsibility and not Defendants' to identify the card and to ensure that the card would be processed properly. This is a legal question which goes to the merits of Plaintiff's claim and is not appropriate for resolution in the context of the class certification issue. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974).

That aside, the issue about whether mistakes were made and what efforts were made to prevent such mistakes relate to the issues of unintentional violations, bona fide error and good faith compliance, all of which are affirmative defenses under EFTA. 15 U.S.C. §§ 2694(m)(c) & (d). However, "the fact that a defense 'may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.'" Beattie, 511 F.3d at 564 (citation omitted). Moreover, whether Defendants had in place a system to prevent error is itself an issue capable of class-wide resolution. As the parties acknowledge, factors which may go into making this determination include not only the text of the scripts, but also what training in EFTA Defendants provided their telemarketers, how Defendants monitored compliance with any such training, whether Defendants changed their procedures in response to consumer complaints, and what they did after receiving billing information to distinguish between debit cards and credit cards. See, Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, LPA, 130 S.Ct. 1605, 1610 (2010)(in action under analogous FDCPA, bona fide error defense contemplates "processes that have mechanical or other such 'regular orderly' steps to avoid mistakes").

Defendants also argue that individual issues will predominate because the law changed effective February 2006 when the Board of Governors of the Federal Reserve System ("the Board") revised its Official Staff Commentary to add that "[g]enerally, requesting the consumer to specify whether the card to be used for authorization is a debit (or check) card or a credit card is a reasonable

15

procedure[.]" 12 C.F.R. § 205.10(b)-7. It is true that EFTA grants the Board the authority and responsibility to "prescribe regulations to carry out the purposes" of the act and its construction of EFTA and Regulation E are considered dispositive "'unless demonstrably irrational." Clemmer, 539 F.3d at 351 & 353 (citations omitted). Nevertheless, the change in the law referenced by Defendants again deals with the bona fide error defense and at most provides Defendants with a better argument for transactions which occurred after its effective date. Besides, it is not clear from the record whether Defendants' telemarketers actually ever used a script which specifically required the customer to identify whether the card was a debit or credit card.

Defendants further contend that individual issues will predominate because each tape will have to be listened to in order to determine whether a particular customer authorized a transaction, as Plaintiff allegedly did in this case. This is an issue which goes to damages, because to recover actual, as opposed to statutory damages under EFTA, a consumer must show detrimental reliance. Vallies v. Sky Bank, 591 F.3d 152, 161 (3d Cir. 2009)(collecting cases). However, "'[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." In re Scrap Metal Antitrust Litigation, 527 F.3d 517, 525 (6th Cir. 2008)(citation omitted).

Moreover, even if it is true that the tapes will be important to determine what was said, both by the telemarketer and the customer, this does not address Plaintiff's other contention that the fulfillment kits which were sent to the consumers were insufficient to be a "copy" of the authentication as required by EFTA. There need be only one common question of law or fact which is predominant. See, Vega v. T-Mobile, USA, Inc., 564 F.3d 1256, 1269 (11th Cir. 2009)(Rule 23(b)(3) "necessarily requires an antecedent finding that there is at least one common question of law or fact").

16

### 2. Superiority

In addition to one or more questions of law or fact which predominate, Rule 23(b)(3) also provides that a class can be certified only if it "is superior to other available methods for adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In making the determination as to whether a class action is the superior method, a court is to consider "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." Id. Each of these factors point in favor of class certification in this case.

First, from what has been presented so far, it appears that any individual recovery for the alleged violations of EFTA would be small. Where there is little incentive to bring suit because of "a small possible recovery," a class action is the "superior mechanism for adjudicating th[e] dispute." Beattie, 511 F.3d at 567. As the Supreme Court has explained:

> "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."

Windsor, 521 U.S. at 617 (quoting, Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)). Further, Plaintiff has presented two discrete legal issues for resolution which have class-wide implications. See, Daffin v. Ford Motor Co., 458 F.3d 549, 554 (6th Cir. 2006)(requiring individuals to separately "litigate their cases is a vastly inferior method of adjudication when compared to determining threshold issues of contract interpretation that apply equally to the whole class").

Second, it does not appear that certifying this action as a class action will impact upon any

17

pending litigation. The MDL case in the Northern District of Ohio contains an EFTA claim, but those claims predate the claims in this case. The Iowa litigation involves only state law claims and will inure solely to the benefit of Iowans.

Third, litigation in this forum is desirable since this case has been litigated in this Court for more than four years and the Court and parties are intimately familiar with the underlying facts and contentions of the parties. Fourth and finally, there is no suggestion that there will be difficulties in managing this case as a class action, apart from whatever difficulties are inherent in litigating any class action.

## IV. **CONCLUSION**

On the basis of the foregoing, Plaintiff's Motion for Class Certification of her EFTA claim (Docket No. 375) will be granted and the Court will certify a class consisting of all persons who were enrolled in one or more of Defendants' membership programs via telemarketing and from whose accounts Defendants initiated the first preauthorized electronic fund transfer at any time during the period of March 14, 2005 until an appropriate end date. The parties will be directed to confer in a good faith effort to (1) determine the appropriate end date for the class period; (2) formulate a proposed form of Notice to the Class which incorporates the requirements of Fed. R. Civ. P. 23(c)(2) and reach an agreement as to the best method for notice; and (3) draft a proposed Certification Order which takes into account the requirements of Fed. R. Civ. P. 23(c)(1)(B). Plaintiff will be instructed to file the proposed Notice to the Class and proposed Certification Order, and Defendants will be given an opportunity to voice any objection to the same.

_____
Todd J. Campbell
United States District Judge